### LEE SIM v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 10, 1914.)

No. 54.

1. ALIENS (§ 32*)—DEPORTATION OF CHINESE—COMPETENCY OF EVIDENCE.
    In a proceeding to deport a Chinese person, his testimony that he was born in New York City was not competent evidence of his United States citizenship, as he could not possibly know the fact.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*]

2. ALIENS (§ 32*)—DEPORTATION OF CHINESE—PRESUMPTIONS AND BURDEN OF PROOF.
    In a proceeding to deport a person of the Mongolian race, there is a natural presumption that he is an alien; and the evidence to overcome the presumption, and show that he is entitled to the privileges of citizenship, should be clear and convincing.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*]

3. ALIENS (§ 32*)—DEPORTATION OF CHINESE—WEIGHT AND SUFFICIENCY OF EVIDENCE.
    In a proceeding to deport a Chinese person, his testimony that he was born in the United States, even if competent, was discredited by his inability to recall the name of a single street, or of any of the teachers who had taught him while he was in school, or anything about the city, except that it was by the water, though he claimed to have lived there 12 years.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*
    What Chinese persons are excluded from the United States, see note to Wong You v. United States, 104 C. C. A. 538.]

4. ALIENS (§ 32*)—DEPORTATION OF CHINESE—EVIDENCE.
    On a hearing before an immigration inspector in a proceeding to deport a Chinese person, he need not hear sworn testimony, but may decide the question on his own inspection and examination.
    [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. ALIENS (§ 32*)—EXAMINATION OF WITNESS—INTERPRETER—SWEARING IN-
TERPRETER.**

On a hearing before an immigration inspector in a deportation proceeding, even though the testimony was given under oath, it was not necessary that the official interpreter, under oath to discharge his duties faithfully, should take a separate oath to do his duty faithfully in that particular case.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*]

**6. ALIENS (§ 32*)—DEPORTATION—WARRANT OF ARREST—SUFFICIENCY.**

A warrant for the arrest of an alien for deportation, which stated that he was unlawfully within the United States, in that he entered without inspection, contrary to the acts of Congress, was not void, as failing to show what acts brought the alien within the excluded classes, and as failing to advise him why he was taken into custody.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*]

**7. ALIENS (§ 32*)—DEPORTATION—COUNTRY TO WHICH ALIEN SHOULD BE DE-
PORTED.**

Under Immigration Act Feb. 20, 1907, c. 1134, § 35, 34 Stat. 908 (Comp. St. 1913, § 4284), providing that the deportation of aliens illegally within the United States shall be to the trans-Atlantic or trans-Pacific ports from which they embarked for the United States, or, if such embarkation was for foreign contiguous territory, to the foreign port at which the alien embarked for such territory, where a Chinese person came to Canada with the intention of being smuggled into the United States, and was so smuggled into this country, he was properly ordered deported to China, instead of Canada.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. § 32.*]

Appeal from the District Court of the United States for the Western District of New York.

This cause comes here upon appeal from an order of the District Court for the Western District of New York, denying the appellant's application for a writ of habeas corpus.

Dilworth M. Silver, of Buffalo, N. Y., for appellant.

John Lord O'Brien, U. S. Atty., and Donald Bain, Asst. U. S. Atty., both of Buffalo, N. Y.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The appellant Lee Sim, is a Chinaman who was arrested in a freight car in the city of Buffalo on March 13, 1914, and has been ordered deported on the ground that he has been found in the United States in violation of the act of Congress approved February 20, 1907 (34 Stat. 898, c. 1134), amended by the act approved March 26, 1910 (36 Stat. 263, c. 128). He is ordered deported for the following among other reasons:

"That the said alien is unlawfully within the United States in that he entered without inspection."

The day following his arrest he was granted a hearing by the immigration inspector at Buffalo to enable him to show cause why he should not be deported in conformity with the law.

Lee Sim, the appellant, is 18 years of age. He left Hong Kong on January 27, 1913, and landed in Vancouver a month later, where he paid the Canadian head tax of $500; from Vancouver he proceeded to Toronto, where he remained two days, and then went on to Windsor, Canada, where he remained about a week. At Windsor he was put into a freight car on Monday going to Buffalo, where he was arrested on Thursday, March 13th, as already stated. He testified that he was born in New York and had recently come from Ha Hung village, Hoi Ping district, China, where his father was then living. He also testified that his father had lived in New York City, but returned to China in 1907, taking him with him at that time.

Lee Sim claimed that he himself had lived in New York 12 years, being 12 years old when he went back to China, and that he had lived in New York City continually from his birth until his return to China. The following statement is taken from the record, giving some of the questions asked of him and his answers thereto:

"Q. Where did you live during the 12 years that you spent in New York City? A. I do not remember.

"Q. Do you remember the names of any street in New York City? A. I do not remember.

"Q. Can you give the names of the streets that comprise Chinatown in New York City? A. I do not remember.

"Q. Can you give the name and address of any Chinese firm in New York City? A. No.

"Q. Can you give the name of any Chinese person who you knew during your residence there? A. I cannot remember any one.

"Q. Can you tell us anything about New York that you remember? A. There is a large body of water near there. * * *

"Q. What did your father do when he was in New York? A. He kept a grocery store.

"Q. What was the name of the firm and where was it located? A. I do not know.

"Q. Was he engaged in that business up to the time that you all left for China? A. Up to a short time before that, he failed in business.

"Q. Did you go to school in New York? A. I was studying Chinese there for two years.

"Q. Where did you attend school? A. I do not remember.

"Q. What was the name of your teacher? A. I do not remember.

"Q. Have you any papers showing your right to be and remain in the United States? A. No, sir.

"Q. Did you ever have any papers to prove your right to be in the United States? A. No.

"Q. Do you know of any one who could recall your birth in the United States and whom you can recall at the present time? A. No. * * *

"Q. When you left China, was it your intention to come to the United States? A. Yes.

"Q. Why did you not take passage for some port in the United States, instead of going to Canada, if you are a native of the United States as you claim? A. I have no papers to show nativity or citizenship, and therefore did not apply at an American port.

"Q. Then it was your intention at the time you left China to be smuggled into the United States? A. Yes.

"Q. And for that purpose you paid the Canadian government a head tax of $500, so that you might have the privilege of landing in Canada? A. Yes.

"Q. When you crossed from Canada into the United States, were you inspected by an immigration inspector? A. No.

"Q. Was your entry surreptitious? A. Yes, sir."

Upon the evidence the Secretary of Labor issued his warrant of deportation and directed that Lee Sim be deported to China. Application having been made for the writ of habeas corpus on the ground that Lee Sim was unlawfully detained, the court below denied the application, and in doing so gave its opinion as follows:

"The petitioner is an alien who entered the United States from Canada on or about March 14, 1913, surreptitiously, contrary to law, and without inspection, and that he was given a fair hearing by the immigrant inspector touching his right to be and remain in the United States, and the immigrant inspector, acting under authority of law and the regulations of the Department of Labor, having reported the proceedings had upon such hearing to the Secretary of Labor, and the Secretary of Labor having thereupon ordered the said petitioner deported, which said decision and order of the Secretary of Labor is made final by law."

[1] The appeal to this court is based among other grounds upon the theory that Lee Sim is a citizen of the United States and that the immigration laws do not apply to him. There is no evidence that he was born in this country beyond his own testimony that he was born in New York and that cannot be accepted as he cannot by any possibility know where he was born. Ark Foo v. United States, 128 Fed. 697, 699, 63 C. C. A. 249 (1904); People v. Etz, 5 Cow. (N. Y.) 315, 320 (1826); Braintree v. Hingham, 1 Pick. (Mass.) 245, 257 (1822).

[2, 3] In these deportation proceedings there is a natural presumption that a person of the Mongolian race is an alien, and it is essential that the evidence to overcome it and to show that the man is entitled to the privileges of citizenship in the United States should be clear and convincing. In the case at bar there is no evidence that Lee Sim is a citizen of the United States, except his unsupported statement that he was born in New York City, and his evidence as to where he was born, as we have seen, is incompetent to prove the fact. But, if his statement were competent, it would be discredited by his inability to remember anything about the city, except that it was by the water. Although he stated that he had lived there for 12 years, he could not recall the name of a single street, or of any teachers who had taught him while he was in school. Upon the record before us there can be no doubt that he was unlawfully within the country, and the finding to that effect must be sustained.

The Supreme Court, in United States v. Wong You, 223 U. S. 67, 32 Sup. Ct. 195, 56 L. Ed. 354 (1912), decided that Alien Immigration Act Feb. 20, 1907, c. 1134, § 36, 34 Stat. 898, 908, applies to Chinese laborers illegally coming to this country, notwithstanding the special acts relating to the exclusion of Chinese.

His counsel complain in this court that at the hearing before the immigration inspector at Buffalo the law entitled Lee Sim to counsel, and that he was not represented by counsel, nor afforded an opportunity to consult an attorney or his friends. But the record shows that he was informed that he had the right to be represented by counsel, and was asked whether he wished to be represented, and that he answered in the negative. He was then asked whether he waived all rights of counsel and was ready then to proceed with the hearing, and he replied that he was. He was fully informed of the purpose of the hearing and

the nature of the charge was explained. He was asked whether he wished an adjournment, so that he could communicate with his friends, to which he replied:

"No; but I want the privilege of writing to friends of mine, and in the event of my finding any testimony for you to give me the opportunity to present it and have the case reopened."

He was asked whether he understood all the questions he had been asked by the interpreter, and he answered, "Yes." He also testified he had been treated kindly throughout the hearing, and that his statements were made without influence or duress.

[4, 5] It is objected that at the hearing the government's interpreter was not sworn to interpret correctly Lee Sim's testimony which was given in the Chinese language. It is said that the interpreter is a witness as well as the person testifying and that the former's evidence which he is giving can be impeached; that the witness was put under oath, but the interpreter was not. We are not aware that it is incumbent at such hearings to put the witnesses under oath. The act does not require the inspectors to take sworn testimony. Although they are empowered to administer oaths, they are not required to do so, but may decide the question of the right of an alien to enter the country upon their own inspection and examination. See Nishimura Ekiu v. United States, 142 U. S. 651, 663, 12 Sup. Ct. 336, 35 L. Ed. 1146 (1892); In re Jem Yuen (D. C.) 188 Fed. 350, 353 (1910). But if at such hearings the testimony had to be given under oath it could hardly be regarded as necessary that an official interpreter under oath to discharge his duties faithfully should be required in each case to take a separate oath that he would do his duty faithfully in that particular case. A judge might with as much propriety be required to take an oath at the beginning of each case he is called upon to try.

[6] It is said that the warrant of arrest is void on the ground that it does not show what act or acts bring Lee Sim within the excluded classes, and that it gave him no knowledge as to the reasons why he was taken into custody. There is nothing to the objection thus raised, for the warrant specifically states "that the said alien is unlawfully within the United States, in that he entered without inspection," contrary to the provisions of the acts of Congress. As the warrant specifically charges him with the fact that he is unlawfully in this country because he entered it without inspection, it is sufficient, if upon a fair hearing the charge is sustained by the facts disclosed, to justify his deportation.

[7] It is contended that this man should not be deported to China, from which he originally came, but should be sent to Canada; that being "the country from whence he came" directly into the United States. It is provided in section 35 of the Immigration Act:

"That the deportation of aliens arrested within the United States after entry and found to be illegally therein, provided for in this act, shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States; or, if such embarkation was for foreign contiguous territory, to the foreign port at which said aliens embarked for such territory."

The question as to whether he is to be returned to China is answered for us by the Supreme Court in the recent case of Lewis v. Frick, 233

U. S. 291, 302, 34 Sup. Ct. 488, 58 L. Ed. 967 (1914). In that case the question was whether the alien should have been deported to Canada, whence he came upon the occasion of his unlawful entry into this country, rather than to Russia, the land of his birth from which he came six years earlier, and it was held that the act admitted of the return of the alien to Russia. The court in the course of its opinion said:

"Respecting this matter, the sections are somewhat lacking in clearness. But at least section 35 indicates a legislative intent that aliens subject to deportation shall be taken to trans-Atlantic or trans-Pacific ports, if they came thence, rather than to foreign territory on this continent, although it may have been crossed on the way to this country."

We entertain no doubt but that under the act Lee Sim should be deported to China, from which place he embarked for the United States, or for the foreign contiguous territory of Canada with the intention of being smuggled into the United States.

Order affirmed.