Ex parte JUNG SEW et al.

(District Court, W. D. New York. December 12, 1914.)

1. ALIENS ⬅⮕32—DEPORTATION—STATUTE.
Petitioners, who were admittedly Chinese aliens, disembarked in Canadian ports, paying the required head tax. After living about a year and a half in Canada, they clandestinely crossed the boundary line and entered the United States. Their deportation to Canada was prevented by the requirement of the Canadian authorities of the payment of an additional head tax by an alien re-entering that country. The Immigration Act (Act Feb. 20, 1907, c. 1134, 34 Stat. 898) provides for the return of aliens unlawfully entering the United States, and unlawfully found therein, to the trans-Atlantic or trans-Pacific ports from which the aliens embarked to the United States, and, if such embarkation was for a foreign contiguous territory, to the foreign port from which such aliens embarked for such territory. Held, that under the statute petitioners might be returned to China; it appearing that they embarked for Canada with the intent of entering the United States.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. ⬅⮕32.]

2. ALIENS ⬅⮕32—DEPORTATION—DEFENSES.
That petitioners were prevented by government officials from returning to Canada, after crossing the boundary line in the Niagara river in a rowboat, is no ground for defense against deportation to China.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92, 93–95; Dec. Dig. ⬅⮕32.]

In the matter of the application of Jung Sew and Jung Jim for writ of habeas corpus. Writ denied.

Dilworth M. Silver, of Buffalo, N. Y., for relators.
Donald Bain, Asst. U. S. Atty., of Buffalo, N. Y., for respondent.

HAZEL, District Judge. This matter comes before me on habeas corpus to determine the legality of the action of the Acting Secretary of Labor in deporting the aliens, Jung Sew and Jung Jim, to China. The relators were apprehended by government officials while surreptitiously entering the United States from Canada at Buffalo, N. Y., on June 2, 1914, and, as claimed by the United States, in violation of the Immigration Act of Congress, approved February 20, 1907, as subsequently amended. The principal objection of counsel for relators to the removal proceedings is that they were instituted under the Immigration Act, and not under the Chinese Exclusion Act; and he claims that the aliens, though Chinese laborers, should be returned to Canada, that being the country from whence they came. This objection, however, is sufficiently answered by the fact that the aliens admittedly were born in China; the port of their embarkation for this country from China being specified in the record.

[1] It is true they disembarked respectively at Victoria and Vancouver, each paying a head tax of $500, and were afterwards domiciled in Toronto, Canada, for nearly a year, before they clandestinely crossed the boundary line and entered the United States; but their deportation to Canada is prevented by the requirement of the Ca-

nadian authorities of the payment of an additional head tax by an alien re-entering the country, and Congress has made no provision for the payment of any head tax when deporting aliens. The Immigration Act merely provides for the return of certain aliens, unlawfully entering the United States and unlawfully found therein, to the trans-Atlantic or trans-Pacific ports "from which said aliens embarked for the United States," and, "if such embarkation was for a foreign contiguous territory, to the foreign port from which said aliens embarked for such territory." This provision would seem to indicate the legislative intent that aliens unlawfully entering the United States may be returned to the country of their birth, if they embarked from there for the United States or territory bordering thereon. It was substantially so held by the Circuit Court of Appeals in the recent case of Lee Sim v. United States, 218 Fed. 432, 134 C. C. A. 232, a holding which has application to the facts herein, and which, of course, I am bound to follow.

On examination before the immigration inspectors the relators admitted that they were smuggled into the United States across the boundary line in Niagara river in a rowboat in charge of white persons. In spite of the fact that they had tarried in Canada for a time after their arrival there, it may fairly be presumed that their objective point was the United States, and their crossing the boundary line dividing the United States from Canada with the intention of entering the United States was in my opinion an unlawful entry within the meaning of the statute.

[2] As a reason for deporting the relators to Canada, instead of to China, it is argued that when they were apprehended by government officials, after crossing the boundary line in the Niagara river, they were ready and willing to return to Canada, but were prevented by said officials from doing so, and were forced to land in the United States. It is difficult to treat this claim with seriousness. The repentance of the white persons who were smuggling the relators into the United States in violation of the statute came too late to profit the relators.

The Chow Chok Case (C. C.) 161 Fed. 627, relied on by the relators, was decided on widely different facts. In the opinion the court stated, it is true, that the word "enter" meant more then the mere crossing of the border line; but in that case the question arose as to whether the government inspectors who arrested the aliens had jurisdiction to exclude them, having followed them a short distance beyond the border. The object of the court was to make a distinction between cases where aliens had gone at large after entry and those just entering at a port of entry.

It is next contended, on the authority of United States v. Redfern (D. C.) 210 Fed. 548, that the Secretary of Labor exceeded his authority in deporting to China relators coming to this country from Canada. But in that case the court found on the merits that the Chinese persons before the court on habeas corpus had been in the United States more than three years, and could not be deported under the Immigration Act to China or to any other country. In Re

Lee Tuck and Lee Moy, also cited by relators, this court held that the detained persons should have been summarily excluded at the time of their attempted entry, and that they could not be deported to China, as there was no evidence to show the port from which they embarked for this country or Canada.

There is also an essential difference between the case at bar and United States v. Sisson, 206 Fed. 450, 124 C. C. A. 356, another case cited by relators. There it was held by the Circuit Court of Appeals for the Second Circuit, on the merits, that, as the birthplaces of the Chinese persons were not shown, the court was bound to require their return to Canada, the country from whence they came, and the fact that Congress had made no provision for the payment of a head tax was held immaterial.

Accordingly I hold that the Acting Secretary of Labor was right in presuming that the relators were citizens and subjects of China, that their entry into the United States was unlawful, that they embarked from a trans-Pacific port in China, the particular port being known, for a territory contiguous to the United States, with the intention of entering the United States, and that his order deporting them to China was proper.

The writs are dismissed.