WALLIS, Asst. Com'r of Immigration, v. UNITED STATES ex rel. NG SAM et al.

(Circuit Court of Appeals, Fifth Circuit. February 11, 1916. Rehearing Denied March 27, 1916.)

No. 2693.

1. ALIENS &#9901;32—DEPORTATION PROCEEDINGS—EVIDENCE.

Four persons of Chinese birth or descent boarded a train at a small village within 100 miles of the Canadian border, with no reasonable explanation of their presence there, though they denied acquaintance with each other. Three claimed to have been born in the United States, and all claimed to have lived in this country all or the greater part of their lives; but none of them had any acquaintance with any part of the United States, and the only one who could speak English at all spoke it slightly and imperfectly. There was found in their possession certain Chinese and Canadian marked clothing and money, certain Canadian addresses, with directions to call there, a letter in Chinese, reciting their attempted entry from Canada and their arrest, and asking help, and $5 in paper money, pinned to the railroad ticket of each one, with a note attached containing the words "Please keep the change." The only two who admitted ever having been in Canada claimed to have merely passed through Canada on a return trip from China, and none of them claimed to have had any residence or domicile in Canada, or to have paid the head tax to the Canadian government necessary to their legally remaining there, and none of them had papers showing their right to be in Canada. *Held*, that evidence of these facts warranted the Secretary of Labor in finding that they were aliens of the excluded class and entered the country in violation of law.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. &#9901;32.]

2. ALIENS &#9901;32—DEPORTATION PROCEEDINGS—EVIDENCE.

Under Immigration Act Feb. 20, 1907, c. 1134, § 35, 34 Stat. 908 (Comp. St. 1913, § 4284), providing that the deportation of aliens arrested within the United States after entry and found to be illegally therein shall be to the trans-Atlantic or trans-Pacific ports from which they embarked for the United States, or, if such embarkation was for foreign contiguous territory, to the foreign port at which they embarked for such territory, the evidence warranted the deportation of such persons to China, rather than Canada, though it was the government's claim that they entered the country from Canada.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. &#9901;32.]

---

&#9901;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. ALIENS ⌾⟶32—DEPORTATION—COUNTRY TO WHICH ALIENS SHOULD BE DEPORTED.

　　Where Chinese persons, claimed by the government to have entered the United States from Canada in violation of law, denied any previous residence, or even presence, in Canada, they were in no position to insist that they should be deported to Canada, rather than to China.

　　[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⌾⟶32.]

4. ALIENS ⌾⟶32—DEPORTATION—COUNTRY TO WHICH ALIENS SHOULD BE DEPORTED.

　　Where four Chinese persons, who boarded a train at a small village near the Canadian border, were apparently attempting to accomplish a joint unlawful entry into the country, the effect of evidence as to the possession by one of them of Chinese clothing and money was not limited to that one, in determining the country to which they should be deported.

　　[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⌾⟶32.]

5. ALIENS ⌾⟶32—DEPORTATION PROCEEDINGS—REVIEW BY COURTS.

　　Where aliens, sought to be deported as having entered the country unlawfully, were given a fair hearing, and there was evidence to support the findings of the Secretary of Labor, the courts were not concerned with the weight to be given the evidence.

　　[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ⌾⟶32.]

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Habeas corpus by the United States, on the relation of Ng Sam, Yee Ngau, Ng Tin, and Ng Sing, against Joseph H. Wallis, Assistant Commissioner of Immigration at the port of New Orleans, to obtain the release of the named Chinese persons, from deportation warrants in proceedings under the Immigration Act of 1907, as amended. From the orders of the District Court for the Eastern District of Louisiana, making the writs of habeas corpus absolute and discharging the relators, defendant appeals. Reversed and remanded, with directions.

Jos. W. Montgomery, Asst. U. S. Atty., of New Orleans, La., for appellant.

B. B. Howard, of New Orleans, La., and Robert M. Moore, of New York City, for appellees.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. The right of the appellant to detain the relators, under deportation warrants issued by the Secretary of Labor, is questioned by the writs. It was conceded by counsel for the relators, in this court but not in the court below, that there was evidence submitted to the Secretary of Labor, in the case of each of the relators, which tended to support his finding that the relators were aliens, who had entered this country from Canada without inspection and in violation of the thirty-sixth section of the Immigration Act of February 20, 1907, as amended by Act March 26, 1910, c. 128, 36 Stat. 264, and of the Chinese Exclusion Laws, which, in view of the conclusive effect to be given such findings, where a fair hearing has been accord-

⌾⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ed the alien, and where there has been no manifest abuse of discretion upon the part of the Secretary of Labor, would support the findings of the Secretary in the instant case, when assailed collaterally upon habeas corpus.

The insistence of counsel for the relators is that the relators, though subject to deportation under proper warrants to Canada, were not legally detained under warrants for their deportation to China. Section 35 of the act of 1907 (Comp. St. 1913, § 4284), is relied upon by the appellant to sustain the deportation of relators to China. It is as follows:

"That the deportation of aliens arrested within the United States after entry and found to be illegally therein, provided for in this act, shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States; or, if such embarkation was for foreign contiguous territory, to the foreign port at which said aliens embarked for such territory."

[1, 2] The contention of the appellant is that the evidence submitted to the Secretary justified the inference found by him that the relators embarked from some port in China for Canada or for the United States by way of Canada. The contention of the relators is that no evidence was submitted to the Secretary, which would support a finding that the relators had embarked from China for Canada or for the United States by way of Canada, and that the warrants directing the deportation of relators to China were without the support of evidence that China was the country from whence they came, and for that reason reviewable upon habeas corpus.

Assuming, without deciding, as was done by the Supreme Court, that that part of the deportation order which determines the destination of the alien is open to inquiry upon habeas corpus (Lewis v. Frick, 233 U. S. 291–304; 34 Sup. Ct. 488, 58 L. Ed. 967), we proceed to consider the respective contentions of the parties.

The evidence submitted to the Secretary of Labor was the testimony of each of the relators upon the hearing, the documents and articles found in their possession when arrested, and the hearsay result of certain inquiries of the immigration inspector addressed to the railroad employés of the railroad upon which the relators were traveling when arrested. We will discard the hearsay statements, and confine our consideration to the admissions of the relators and to the documents and articles found on them when arrested. The latter consisted of certain Chinese and Canadian marked clothing and money; certain Canadian addresses, with directions to call at the named address; a letter in Chinese, reciting their attempted entry from Canada and their arrest, and asking help; and $5 in paper money, pinned to the railroad ticket of each of the relators, with the note attached containing the words "Please keep the change." The four relators, while denying acquaintance, boarded the same train at Port Kent, a small village in New York, less than 100 miles from the Canadian border, and without a reasonable explanation to account for their joint presence there, or how or from what place they arrived there, either singly or in company. Though three claimed to have been born in the United States, and all claimed to have lived in this country all or the greater part of their lives, no one of them had any acquaintance with any part of the

United States, and but one could speak English at all, and he but slightly and imperfectly. That they came to Port Kent and took the train there separately and without concert, and from places in the United States strange to them, but where they had resided for many years, and without the intervention of persons, more familiar with the surroundings and manner of travel, overtaxes the credulity of the least suspicious. The inference that they came to Port Kent and boarded the train, upon which they were subsequently arrested, in company and with the assistance of more competent persons, and in an endeavor to enter the United States by evading inspection, is irresistible. The inference is just as conclusive, from their attempted evasion of the provisions of the Immigration Act, that they could not have successfully encountered the inspectors at the border, and were not entitled to enter the United States. Counsel for the relators contend that, if so much is to be conceded, it shows only that the relators were seeking to make an unlawful entry into this country from Canada, and that no fair inference can be indulged therefrom that the relators had originally embarked from China, and that the latter inference was essential to the detention of relators under the deportation warrant.

The contention of relators is that the only legal evidence presented to the Secretary was their own statements, and possibly what was taken from their persons when they were arrested; that if their statements were credited, they were entitled to entry, and if discredited as to the place of their nativity and residence, because of the suspicious circumstances of their presence in Port Kent, their statements would not justify an inference that they came from a country more remote than Canada into this country, nor would the articles found in their possession. Three of the relators testified that they were born in the United States, and one admitted birth in China. All claimed to have lived in this country, except when on short visits to China, since they were children. Three denied having been either in Canada or China for more than three years before the time of their arrest, and the fourth denied absence from this country for more than a year from the time of his arrest. The two who admitted a previous presence in Canada asserted that they landed at Vancouver on a return trip from China, and merely passed through Canada on their way back to this country. No one of them claimed to have had a residence or domicile in Canada just prior to their entry into this country, but, on the contrary, asserted a continuous residence in the United States, dating back therefrom for periods varying from a year to a lifetime. No one of them claimed to have paid the head tax to the Canadian government, necessary to their legally remaining there. No one of them had papers showing their right to be either in this country or in Canada. It is said that their being Mongols is no evidence of birth in China, and a fortiori of their debarkation from China to Canada or the United States; that, if their story of birth and residence in this country is untrue, its untruth leaves the record merely negative as to their place of birth and debarkation to the United States, and without support that it was China.

[3] The record, however, does contain convincing evidence that they entered this country recently before their arrest and from Canada.

They each denied upon the hearing a previous residence or even presence in Canada. They are therefore not in a position now to assert that their entry into this country was from Canada, where they had had theretofore a domicile, and insist on their right to be returned there, in the face of their denial upon the hearing that Canada was the country from whence they came to this country.

[4] It might be that, if the record contained only the statement of the relators that they were born and had lived in the United States all their lives, the argument that, even if such statements were discredited, it would leave the record with no proof of their actual place of nativity or debarkation, might prevail. In this case the record further shows that relators were discovered and apprehended under circumstances satisfactorily showing that they had recently crossed the Canadian border in an attempt to evade the immigration authorities, which itself was an implied confession that they had no legal right of entry into this country. Upon their arrest, they denied having been in Canada, but asserted continued residence in the United States, and admitted not having complied with the Canadian requirements as to residence therein. The falsity of such denial, as shown by the surrounding circumstances and the articles of Canadian make found on them, should not avail to prove for them a legal residence in Canada, but rather the fact that they were using that country, not as a legitimate domicile, but the more easily to accomplish their unlawful entry into this country from China. Their established recent presence in Canada, taken in connection with their false denial of such presence, when arrested in the attempt to enter without inspection, is sufficient warrant for the inference that Canada was not the country from which they started on their illegal undertaking, and that it was not the country of which they were natives or citizens. The Chinese clothing and money found on one of them but corroborates the inference, and, as the four were undoubtedly attempting to accomplish a joint unlawful entry, the effect of this evidence is not to be limited to the one upon whom the articles were discovered.

[5] We think the evidence submitted to the Secretary of Labor tended to establish that all of the relators were aliens of the excluded class, that they entered this country in violation of the provisions of the Immigration and Chinese Exclusion Laws, and that they embarked from a port in China for Canada, or by way of Canada, with the United States as their ultimate destination. With the weight to be given the evidence we are not concerned, since the relators were given a fair hearing and the Secretary is not shown to have manifestly abused his discretion in arriving at his findings.

In the case of Lewis v. Frick, 233 U. S. 291, 34 Sup. Ct. 488. 58 L. Ed. 967, the Supreme Court disregarded the story of the alien as unreasonable, and also disregarded the contention that, laying it aside, there was nothing left in the record on which to predicate an illegal entry, and deduced the fact of intercourse from the alien's admission, while discarding his statement of a previous marriage, and by doing so arrived at the immorality of the intercourse. The court said (page 299 of 233 U. S., page 491 of 34 Sup. Ct. [58 L. Ed. 967]):

"The story is extraordinary. How it happened that the alleged wife, who had known him as Prezysuskier in Warsaw, was able through the good offices of an entire stranger to identify him as Lewis, in Detroit, more than six years later, was not explained. The alleged husband's readiness to accept her is equally suspicious. There were other circumstances tending to discredit the story of the marriage. And if that story fell, the inference of unlawful purpose was irresistible. * * * But, without regard to them [certain omitted exhibits] enough appears to show that he [the Secretary of Labor] was fully justified in concluding as a matter of fact that the whole story of marriage in Warsaw was a fabrication, and that in truth Lewis went from Detroit to Windsor upon information from which he inferred that the woman was an alien and a prostitute, willing to accompany him to Detroit for an immoral purpose, and that he brought her to Detroit for that purpose. This being so, and there being no contention that the hearing was not fairly conducted, the finding of the Secretary upon the question of fact is binding upon the courts."

The court further said in that case (page 302 of 233 U. S., page 492 of 34 Sup. Ct. [58 L. Ed. 967]):

"The final contention is that petitioner should have been deported to Canada, whence he came upon the occasion of his unlawful entry into this country, rather than to Russia, the land of his birth, from which he came six years earlier. * * * But, at least, section 35 indicates a legislative intent that aliens subject to deportation shall be taken to trans-Atlantic or trans-Pacific ports, if they came thence, rather than to foreign territory on this continent, although it may have been crossed on the way to this country. * * * The theory of the act, as expressed in section 2, is that the undesirables ought to be excluded at the seaport or at the frontier; but sections 20, 21, and 35 recognize that this is not always practicable. Of course, if petitioner's attempt to bring a woman into the country for an immoral purpose had been discovered in time, he might have been physically excluded from entry at Detroit upon his return from Windsor. In that event he would naturally have remained upon Canadian soil. But since his offense was not discovered in time to permit of his physical exclusion, so that he becomes subject to the provisions for deportation, his destination ought not to be controlled by the factitious circumstance that he went into Canada to procure the prostitute. And, upon the whole, it seems to us that the act reasonably admits of his being returned to the land of his nativity, that being in fact 'the country whence he came' when he first entered the United States."

In the case of United States v. Ruiz, 203 Fed. 441, 121 C. C. A. 551, decided by us, the alien was a naturalized citizen of the republic of Panama, from which country he entered the United States. The order of deportation directed his return to Spain, the land of his nativity, and we held that he should have been deported to the republic of Panama, from which he came, and of which he was a citizen. There is no inconsistency between that case and our present ruling. Nor is the case of United States v. Sisson, 206 Fed. 450, 124 C. C. A. 356, decided by the Circuit Court of Appeals for the Second Circuit, necessarily in conflict with our decision in this case. The holding in that case was that in the absence of all evidence from the record as to the land of the alien's citizenship or departure, except that he was a Chinese person, there could be no inference drawn that he was a citizen of and had embarked from China. We have found other evidence, tending to show those facts, in the record submitted in this case.

The case of Lee Sim v. United States, 218 Fed. 432, 134 C. C. A. 232, decided subsequently by the same court, supports our conclusion. In that case, though the entry was, as in this case, from Canada, the

deportation was to China, because the court found that there was evidence before the Secretary, in the admissions of the alien, that he had embarked from China for a Canadian port, with the ultimate purpose of reaching the United States. In this case, while there was no express admission by any of the aliens to like effect, their conduct constituted an implied admission, which was also corroborated by what was found on their persons at the time of arrest. The difference relates to the persuasiveness, and not to the existence, of the evidence in the record, and so presented a question for the Secretary, and not for the court.

The court below, without the benefit of the concession made by counsel for the relators in this court, and of the recent opinions quoted from, came to a different conclusion. The orders making the writs absolute and discharging the relators will be reversed, and the cause remanded, with directions to dismiss the writs, at the costs of the relators.