UNITED STATES ex rel. KARAMIAN v. CURRAN, as Commissioner, etc.

(Circuit Court of Appeals, Second Circuit. January 10, 1927.)

No. 140.

1. Habeas Corpus ⬅23—Habeas corpus may be used to determine proper disposition of alien ordered to be deported (Comp. St. §§ 1279, 1280).

Under Rev. St. §§ 751, 752 (Comp. St. §§ 1279, 1280) habeas corpus may be used to determine proper disposition of alien ordered to be deported, arising on appeal from order modifying order of deportation by directing alien to voluntarily return to foreign country.

2. Aliens ⬅54(10)—Order of "deportation" held improper, since substantially permitting alien to return to foreign country as he pleased.

Order of "deportation," substantially permitting alien to return to foreign country when

and as he pleased, *held* improper, since deportation means compulsory action.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Deportation.]

3. Aliens ⬡⟹54(12)—Alien ordered deported should be returned to country from whence he sailed, or, if refused, to country of which he is citizen (Immigration Act 1917, § 20 [Comp. St. § 4289¼k]).

Under Immigration Act 1917, § 20 (Comp. St. § 4289¼k), an alien ordered deported should be sent to country from whence he sailed after having established place of abode, or, if such country refuses him, returned to country in which he previously resided, or country of which he is citizen.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus by the United States, on the relation of Yerwand or Yerwant Karamian, against Henry H. Curran, as Commissioner, etc. Order sustaining the writ, and modifying the order of deportation, and respondent appeals. Reversed and remanded.

Relator is by race an Armenian, but was born in and is still a subject or citizen of Persia.

According to his own statement, he lost his father while he was an infant, and his mother died when he was eight years old. He has a sister, who is still in Persia, also an uncle; and a brother in New Britain, Conn. Prior to September, 1917, he and other boys of his race were most cruelly treated by the Turks, and he himself "burned from the hip to the knee with a hot steel rod, because they wanted me to be a Mohammedan, and my right leg is not very strong yet, although I can walk very well." In 1917 he was apparently rescued by the British and sent to "a refugee colony, and went to Bagdad, Mesopotamia," where he remained about three years. Thence he went to Bombay, India, and there remained less than three months, and then to Marseilles, France, and lived there for about a year.

He endeavored to obtain a properly viséd passport for the United States, and, failing in that, he sailed from St. Nazaire, France, on a French steamer, to Vera Cruz, Mexico, where he arrived in January, 1925.

Shortly thereafter he went to Juarez, Mexico, where he remained about nine months. During his stay in Mexico, at all events, he was supported by his brother in New Britain, Conn., and he admittedly went to Mexico for the purpose of reaching the United States from that country.

He finally endeavored secretly to enter the United States, was detected, and arrested near El Paso, Tex., and sentenced to three months' imprisonment for violation of the Immigration Law. Having served this sentence at El Paso, Tex., he was held for deportation, and after investigation that revealed the above facts a warrant was issued directing that he be returned "to Persia, the country whence he came."

Thereupon a writ of habeas corpus was obtained, and, after hearing, the court below directed that the writ be "sustained, and that the order of deportation be and the same hereby is modified by directing that the relator be permitted voluntarily to return to Marseilles, France."

From this order the Commissioner of Immigration appealed.

Emory R. Buckner, U. S. Atty., of New York City (Nathan R. Margold, Asst. U. S. Atty., of New York City, of counsel), for appellant.

Vahan H. Kalenderian, of New York City, for appellee.

Before HOUGH, MANTON, and MACK, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The matter at bar is singular, because a writ of habeas corpus primarily inquires into the legality of a relator's detention or imprisonment, and we here start with an admission that Karamian's present deprivation of liberty is entirely lawful. This results from his own story, as above summarized; and counsel admits that he must be deported—i. e., sent out of the United States somewhere. The only purpose of the writ is to ascertain where he must or may go, and how he shall get there.

The direction below was that he "be permitted voluntarily to return to Marseilles, France," which, taken literally, is a discharge on condition that he removes himself to France as soon as may be reasonable, or perhaps convenient.

This state of facts is apparently unique and presents several questions:

(1) Can habeas corpus be used, not to test the legality of an imprisonment, but that of the action which will be taken when respondent's custody of relator ceases?

(2) If the writ suffices for its attempted purpose, was the order appealed from proper?

(3) If the writ was well issued, but the order wrong in form or substance, what must be done with Karamian?

The action challenged by the first ques-

tion has undoubtedly been taken by this court, on several occasions, though never, we think, where it was not preceded by inquiry into the right to deport. United States ex rel. Moore v. Sisson (C. C. A.) 206 F. 450, which in effect overruled the Ueberall Case (United States v. Williams) 187 F. 470, in District Court for S. D. of N. Y. See, also, United States v. Ruiz (C. C. A.) 203 F. 441, and Wallis v. United States (C. C. A.) 230 F. 71, in Fifth Circuit.

But after the Supreme Court had deliberately left the question open in Lewis v. Frick, 233 U. S. 291, 34 S. Ct. 488, 58 L. Ed. 967, the matter came up squarely in United States ex rel. Hen Lee v. Sisson, 232 F. 599, and this court again asserted and exercised the power to ascertain the lawful port or place to which the alien should be deported, and do so in habeas corpus proceedings. We also therein directed the appropriate amendment of the order or warrant of deportation.

[1] We fully recognize the technical difficulties inherent in such procedure. We act by statute, and sections 751, 752, R. S. (Comp. St. §§ 1279, 1280) authorize the judges to grant habeas corpus only for the "purpose of an inquiry into the cause of restraint of liberty," and it is certainly true in this case that the cause of Karamian's restraint is an admitted liability to deportation. It is also true that a remedy is afforded for an *intent* on the part of the Secretary of Labor to send an alien to an unlawful destination, by proceedings against him in the courts of the District of Columbia, and it is just as true that by the course of practice, of which we take notice, an alien who is to be deported over seas (and nearly all of them must so leave this country) is placed, when the Commissioner's custody ends, in the custody of a ship captain, who is to leave for foreign parts in probably a few hours, and it cannot be doubted that, if that captain detained the alien in order to take him to an unlawful destination, habeas corpus would lie to relieve against such custody.

It is hard to say whether, for the average unlawful entrant in this country, suit in Washington, D. C., or a last hour writ against a shipmaster, is the more illusory remedy. If such litigants are to have any real chance for a hearing, it can only be under a writ cheaply obtainable and directed to an official easily reached and officially residing in one known place. If habeas corpus, as used in this circuit, cannot reach this wrong, it is practically remediless, and to widen the scope of the writ, to embrace a

possible future wrong that grows out of the exercise of the present right of detention, is, we think, allowable. It is certainly not different in kind or extent from the frank use of the writs of prohibition and/or mandamus by the Supreme Court promptly to rectify matters in the trial courts, instead of relegating litigants to future appeals or writs of error. For these reasons (frankly ab inconvenienti) we adhere to our previous rulings and answer our first inquiry in the affirmative.

[2] As to the second question, we think the order wrong, in that it does not direct deportation at all. It substantially tells the Department of Labor to let Karamian go to Marseilles when and as he pleases. Deportation means compulsory action; this order does not.

So we reach the third query, as to what the order should have required. This depends on the scope and meaning of section 20 of the Immigration Act of 1917, which is set forth in a note below,[1] as punctuated in the Statutes at Large (39 Stat. 890 [Comp. St. § 4289¼k]).

The single ill-drawn sentence of this section falls into three subdivisions:

(1) The general provision that aliens deportable under the statute shall go to their foreign port of embarkation or "the country whence they came" at the Secretary's option.

(2) A special provision for such of the class of deportable aliens as embarked originally for "foreign contiguous territory," and we think it clear that the Secretary has the same option as to this "contiguous territory" class that he has specifically as to deportable aliens generally, for all are deportable alike, and no reason can be seen for sending those who come *directly* to the United States to either their port of embarkation or the "country whence they came," but

---

[1] NOTE.—"That the deportation of aliens provided for in this act shall, at the option of the Secretary of Labor, be to the country whence they came or to the foreign port at which such aliens embarked for the United States: or, if such embarkation was for foreign contiguous territory, to the foreign port at which they embarked for such territory; or, if such aliens entered foreign contiguous territory from the United States and later entered the United States, or if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their re-entry, or imposes any condition upon permitting re-entry, then to the country of which such aliens are subjects or citizens, or to the country in which they resided prior to entering the country from which they entered the United States."

sending those who came *indirectly* only to their embarkation port. The grammatical construction permits this reading, for this second subdivision of sentence is an ellipsis indicating inclusion, or extension of the thought of the first subdivision, viz. that aliens *may* at the Secretary's option be sent back to the particular spot where they took shipping, or to the "country whence they came."

(3) This subdivision, like the second, does not in itself confer any power of deportation; that must be found in the first subdivision of the sentence. It relates to several subclasses of "such aliens"; i. e., the deportable ones first above alluded to, viz.: (a) Those *entering* the United States from foreign contiguous territory, after having entered said territory from the United States; and (b) those who are refused unqualified readmittance by the country from which they *"entered the United States."* These subclasses are in our judgment to be sent, by virtue of the power given in the first subdivision (there is no other), to the country of their citizenship *or* that of their residence before going to the country from which they entered. But who is to decide between these alternatives? Obviously the Secretary; so that the clause as to his optional power affects every subdivision of the clumsy sentence.

It is evident that an individual deportable alien may belong to more than one of those subclasses. Thus Karamian is of those (second subdivision) who embarked for foreign contiguous territory, but he also (third subdivision) *entered* this country from Mexico, in the sense that he physically came here for the first time from that country.

But he confessedly used Mexico only as the front porch or doorstep by which to enter the United States, and no one has suggested deportation to Mexico, so the question arises whether, in the sense of the statute, he can be regarded as an entrant from Mexico. We think not, and hold that in a legal sense he *entered* from France; consequently, if France refuses him, the Secretary has the option of sending him to Mesopotamia, his next previous residence, or to Persia, the land of his citizenship.

We are informed that departmental rule or custom identifies the "country whence he came" with the land of which he is a "citizen or subject." This is plainly wrong; under such a ruling an unnaturalized Frenchman who from infancy had resided in England, and came as a deportable alien to this country from a German port would be said to have *come from* France.

The exact meaning of *coming from* a country, or other terminus a quo, cannot in our judgment be stated in general and accurate terms. The meaning of the phrase will depend on circumstances. This is apparent if it be considered in its everyday usage, which is the very way it is assumed to be used in statute making. Whether one meets a friend, a relative, or a total stranger, arriving after a journey concerning which no information is at hand, the question is natural, "Where did you come from?" But one would assuredly expect very different, yet equally honest, answers from the friend, whose general antecedents were familiar, and from the stranger, even though both had just left the same vehicle after the same journey. This only shows clearly that such a vague colloquial form of speech is unsuited for statute making; but, applying the facts of this case to it, we are of opinion that Karamian "came from" France, because he had been there long enough to have a place of abode, whether it was technically a residence or domicile, or neither of them, we do not regard as material; he "started" from France for the United States, so he "came from" that country. But whether another alien, though passing through the same regions, but having a different life history, would be viewed in the same way cannot be affirmed; every case depends on its own facts.

[3] Conclusion is, the relator should be *sent*, not politely permitted to go as he pleases, to St. Nazaire, whence he sailed, or to France generally, whence he came, or, if France refuses him, to Mesopotamia, where he resided before he abode in France, or to Persia, the country of which he is a citizen.

The order must be reversed, and the matter remanded, for the entry of a new order, directing the amendment of the warrant of deportation in the manner last above indicated. In doing what we think the law requires, we further feel it right very pointedly to call to the attention of the Secretary of Labor what weight of responsibility for possible human woe the statute places on his shoulders. This man has, on this record, been viewed with disfavor because he was detected in trying to smuggle himself within our borders. This is natural enough, and he is not an ignorant, uninformed person, to be excused by his ignorance. Yet, on the same record, to send him back to Persia is a step fraught with such probabilities of suffering

that we publicly hope for the exhaustion of every possibility, including congressional action, before this man is doomed to the land of his birth.

Let mandate issue as above indicated.