**LY SHEW v. ACHESON, Secretary of State (two cases).**

Nos. 30159, 31161.

United States District Court
N. D. California, S. D.

Jan. 12, 1953.

Stanley J. Gale, Sacramento, Cal., for plaintiff.

Chauncey Tramutolo, U. S. Atty. and Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for defendant.

GOODMAN, District Judge.

These are two suits, among hundreds, filed in this court by persons of Chinese ancestry, pursuant to Section 503 of the Na-

tionality Act of 1940, 8 U.S.C.A. § 903, seeking judgment declaring plaintiffs to be nationals of the United States. Ly Moon, plaintiff in No. 31059, aged approximately seventeen years at the time of the filing of the complaint herein, and Ly Sue Ning, plaintiff in No. 31161, aged approximately fifteen years, both claim to be the blood children of one Ly Shew, the latter admittedly a male citizen of the United States by derivation. Ly Moon alleges that he was born in China, the son of Ly Shew and one Ly Chin Shee, on or about October 18, 1933; Ly Sue Ning alleges that she is the daughter of Ly Shew and Ly Chin Shee, born in China on or about January 26, 1937. Neither has ever been in the United States except for the immediate purpose of prosecuting these actions. Both claim United States citizenship by virtue of Section 1993 of the Revised Statutes[1] which bestowed citizenship upon foreign-born children of citizen fathers. Ly Moon's claim *does* arise under Section 1993 because that statute was effective at the time of his birth. But Section 1993 was amended in 1934, prior to Ly Sue Ning's birth, by the Act of May 24, 1934, 48 Stat. 797.[2] The amendment provided that United States citizenship should not descend to a foreign-born child of a citizen father until the child had resided in the United States for five years continuously preceding his eighteenth birthday. Ly Sue Ning has not and could not now meet that condition. Her claim to citizenship must rest upon Subsections (g) and (h) of section 201 of the Nationality Act of 1940, 8 U.S.C.A. § 601(g), (h),[3] which supersede Section 1993 of the Revised Statutes. These Subsections of the Nationality Act retroactively vest United States citizenship in a citizen's child born abroad after May 24, 1934, the effective date of the amendment to Section 1993, subject to divestment if the child does not reside in the United States for a period totaling five years between the ages of thirteen and twenty-one.

The testimony at the trial, which lasted three days, was entirely given in the Toy Shan Chinese dialect and interpreted into English. Neither Ly Shew, the alleged father, nor the plaintiffs, nor the witness in behalf of plaintiffs, could speak a word of English.

---

1. Sec. 1993. "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States."

2. 48 Stat. 797. "Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend to any such child unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child. In cases where one of the parents is an alien, the right of citizenship shall not descend unless the child comes to the United States and resides therein for at least five years continuously immediately previous to his eighteenth birthday, and unless, within six months after the child's twenty-first birthday, he or she shall take an oath of allegiance to the United States of America as prescribed by the Bureau of Naturalization."

3. "(g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years, the other being an alien: Provided, That, in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: Provided further, That, if the child has not taken up a residence in the United States or its outlying possessions by the time he reaches the age of sixteen years, or if he resides abroad for such a time that it becomes impossible for him to complete the five years' residence in the United States or its outlying possessions before reaching the age of twenty-one years his American citizenship shall thereupon cease.

\* \* \* \* \*

"(h) The foregoing provisions of subsection (g) concerning retention of citizenship shall apply to a child born abroad subsequent to May 24, 1934. \* \* \* "

Many times the interpreter carried on extensive dialogues with the witnesses before obtaining a response to a question propounded. Inconsistencies and contradictions in testimony became manifest. To fairly determine their effect is difficult, if not impossible. Familiar as we are in this court with Chinese-interpreted testimony, it can be categorically stated that it is well-nigh impossible to determine the credibility of such witnesses. At least, after ten years of constant trial work, I find it so. Against this unsatisfactory evidentiary background the following general picture has emerged:

Ly Shew, the alleged father of plaintiffs, was admitted to the United States in July of 1912, as a citizen. His citizenship was derived from his father by virtue of the citizenship of the latter. Ly Shew claims to have been, since his entrance into the United States and up to the time of the trial of the cases, a permanent resident of the City and County of San Francisco, State of California, in this District, making his livelihood here. During the course of the years following his entry into the United States, he made several trips to China. On the occasion of one of these trips in 1932, he claims to have married one Ly Chin Shee in the Toy Shan District, Kwan Tung Province, Canton, China. It does not appear that any marriage, according to Western standards was had, but that a declaration or acknowledgment of some kind, the nature of which is obscure, took place. He claims that in the following year 1933, plaintiff Ly Moon was born and that on a subsequent visit to China in 1937, the plaintiff Ly Sue Ning was born. He never engaged in any business in China, going there, as he said, to "rest and visit." His permanent residence was always in San Francisco. It may be said, without in any way intending to be facetious, that the main object of his visits to China was for the purpose of procreation. There is testimony that some money was sent to China by Ly Shew from San Francisco to his alleged wife.

As to the paternity of plaintiffs, the government did not and obviously could not present any evidence. For the area within Communist China, wherein plaintiffs claim to have been born and wherein the alleged mother is said to be, and wherein plaintiffs claim to have lived their entire lives, has long been closed to any opportunity for investigation or verification. Thus the only recourse of the defense was to cross-examine the witnesses.

The first, and, indeed the essential requisite to a just decision here, is to determine what standards should be applied in weighing and appraising the evidence offered in behalf of plaintiffs. For these and companion cases are not orthodox adversary suits. Despite the fact that the Secretary of State is party defendant, in every real sense, the people of the United States are defendants. This court is called upon to declare the nationality of plaintiffs. Hence the paramount necessity of an adequate legal yardstick with which to measure the evidence.

Proper selection of standards requires a preliminary consideration of certain historical background. As well it requires an analysis of the statutory history and purpose. And also there is needed an understanding of the unique problem posed by the hundreds of similar cases now before the court.

First as to historical background.

After the discovery of gold in California, a huge number of Chinese immigrants came to the United States, particularly to California. This mass immigration eventually resulted in the enactment of the Chinese Exclusion Acts[4] in 1882, for by that time over 200,000 Chinese had come principally to California. These Acts were, from time to time, extended by successive statutes. They remained in existence until December 17, 1943,[5] when all the Exclusion Acts were repealed. Simultaneously with repeal of the Acts, Chinese were made eligible for immigration and naturalization and an annual quota of 105 was established. 57 Stat. 600.

4. 22 Stat. 58.

5. 57 Stat. 600.

During the years prior to 1943, thousands of American males of Chinese ancestry, being unable, it is asserted, to find spouses in this country, made periodic visits to China and begot offspring. Up until the effective date of the Nationality Act of 1940, Act of Oct. 14, 1940, 8 U.S.C.A. § 501 et seq., there was no specific statutory provision which entitled persons living abroad and claiming United States nationality to have their nationality decreed by court order. So up to that time, American males of Chinese ancestry, who had begotten offspring on visits to China and desired to have the American nationality of such offspring established, as provided, since 1855, by § 1993, Revised Statutes, and, since 1934, by 48 Stat. 797, caused such offspring to come to the United States and they were either admitted by Immigration as United States nationals or denied admission. If any further recourse was sought, it was by way of habeas corpus in federal courts to review Immigration administrative decision. Upon such review, as is now well known, the limit of judicial inquiry was whether the administrative proceedings had afforded due process.

As to the history and purpose of § 903.

8 U.S.C.A. § 903,[6] authorizing judgments declaratory of United States citizenship, became effective as a part of the Nationality Act of 1940 on January 13, 1941. But the first Chinese suit under § 903 was not commenced until August 1947. Mah Yung Og v. McGrath, D.C.Cir., 187 F.2d 199. And in this District the first Chinese case under § 903 was filed June 29, 1949. Two more were filed in the same year. In 1950, 22 additional cases were filed. In 1951, 161 cases were filed. Then came the deluge. By the close of business on December 24, 1952,[7] there were on file in this District a total of 716 cases. By the same date, 189 cases had been filed in the Southern District of California, a grand total of 905 cases in both California Districts. As

6. § 903. "If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. If such person is outside the United States and shall have instituted such an action in court, he may, upon submission of a sworn application showing that the claim of nationality presented in such action is made in good faith and has a substantial basis, obtain from a diplomatic or consular officer of the United States in the foreign country in which he is residing a certificate of identity stating that his nationality status is pending before the court, and may be admitted to the United States with such certificate upon the condition that he shall be subject to deportation in case it shall be decided by the court that he is not a national of the United States. Such certificate of identity shall not be denied solely on the ground that such person has lost a status previously had or acquired as a national of the United States; and from any denial of an application for such certificate the applicant shall be entitled to an appeal to the Secretary of State, who, if he approves the denial, shall state in writing the reasons for his decision. The Secretary of State, with approval of the Attorney General, shall prescribe rules and regulations for the issuance of certificates of identity as above provided. Oct. 14, 1940, c. 876, Title I, Subchap. V, § 503, 54 Stat. 1171."

7. By the provisions of the Immigration and Nationality Act of 1952, McCarran Act, 66 Stat. 166, 8 U.S.C.A. § 1101 et seq., effective December 24, 1952, the remedy of court action granted by former Section 903 is available only to persons who are within the United States. Immigration and Nationality Act of 1952, § 360(a), 8 U.S.C.A. § 1503(a). Thus none of the suits now pending in this District could have been brought under the present statute, for none of the plaintiffs were within the United States upon the filing of the complaints. There is a possibility, somewhat remote, that the savings clause of the McCarran Act, § 405(a), may permit the filing of some suits under old Section 903, in cases of the vesting of rights prior to the effective date of the McCarran Act. 8 U.S.C.A. § 1101 note.

near as may be presently ascertained, a total of 1288 cases (including the California suits) have been commenced in the United States. Of the non-California cases, 9 were filed in the District of Oregon and 61 in the Western District of Washington. Thus 75% of all cases are to be determined in this District.

It has been blithely assumed that plaintiffs, who never have been in the United States and who have lived their lives as Chinese, have the status and right to avail themselves of § 903. Let us see, by studying Congressional proceedings and examining the language of the statute and its relation to the Nationality Code, whether this is so.

First of all it should be observed that Section 903 is a part of Subchapter V of the Nationality Code of 1940, which immediately follows Subchapter IV, dealing with the subject of expatriation or loss of nationality. The many new grounds for expatriation created by Subchapter IV prompted the Congress to afford a means of protection for persons abroad charged with being expatriates. While the opening words of Section 903 broadly state that "any person" denied a right of citizenship may seek a declaratory judgment, it is clear that the section was designed primarily to protect those who might run afoul of the expatriation provisions of Subchapter IV. See 86 Congressional Record 13247–48. Section 903 permits such persons to sue in a Federal District Court, whether "within the United States or abroad".

The Congressional proceedings, plus the place of Section 903 in the Nationality Code, persuasively indicate that, in enacting that Section, the Congress never contemplated that it should be availed of by persons who never have been in the United States and against whom *no charge of expatriation* has been made. That the issue of *expatriation* was the basis upon which the Congress afforded the judicial remedy to those abroad is further manifest by the provision in Section 903 that a "certificate of identity shall not be denied

*solely* on the ground that such person has *lost* a status previously had or acquired as a national of the United States".

There is no doubt about the Congressional intent to allow any person *in the United States* to bring suit under Section 903, if any of his rights or privileges as a citizen are denied. But as to those abroad, the objective of the statute is clearly in aid of those charged with expatriation. There is not the slightest evidence that the Congress ever intended Section 903 to encompass a declaratory proceeding to determine the identity of claimants such as plaintiffs.

The real purpose and intent of § 903 is pointed out, not because the court intends to rest decision upon an interpretation of the statutory meaning, but to emphasize the need for careful scrutiny of these and like causes. For it appears that in not one single case of the 716 pending is the issue of expatriation tendered. In each case the issue to be determined is that of *identity*, namely, who is the person who makes the claim of United States nationality?

As to the special problem of the 716 cases.

In the Southern District of California, in the case of Mar Gong v. McGranery, D.C., 109 F.Supp. 821, Judge Westover, who has tried approximately 20[8] of the 189 cases on file in that District, calls attention to the "mutuality" of the facts in the cases of these Chinese-born plaintiffs. He points out that: (1) the alleged father is a citizen by derivation; (2) the father returns to the ancestral village to marry; (3) a child is born within a year; (4) the father returns to the United States after the wife has conceived a second time; (5) other children are conceived, in some cases, upon subsequent visits to China; (6) when the children are in midteens, they apply to come to the United States; (7) usually the last-born child is not seen by the father until arrival in the United States; (8) each visit to China produces another "crop" of sons; (9) apparently there is no impotence, because every visit to China results

8. Besides the instant causes, I have heard the cases of four other plaintiffs and am this day filing decisions as to them.

in offspring; (10) the offspring are preponderantly male; (11) the offspring are all born in an unknown rural village, where the homes and villages are described as being alike; (12) there are no doctors, only midwives; (13) all offspring survive and are strong and healthy.

Substantially most of what Judge Westover says applies to the cases in this District.

It is well to consider these matters, because of the amount of judicial time which may be required to dispose of these cases. We have estimated that it will take the full time of one of the judges of this court 8 years to try and dispose of the cases. And if all seven judges of the court were to devote all their time to their disposition, it would require over one year to clear the calendar of the § 903 cases.

The government has contended that the records of the State Department show that many of the applications for certificates of identity made to consular officers in Hong Kong (the only consular office now functioning in continental China) are fraudulent. It further points out the impossibility of checking the identity of the applicants.

A survey of the 716 cases here shows that 95% of the plaintiffs claim to have been born in Kwang Tung Province and 62% in the *Toy Shan District* of Kwang Tung Province. The villages alleged to be the places of birth are unknown to United States authorities and cannot be located on available maps.

An examination of 354 of the 716 complaints shows 367 of the plaintiffs to be males and 39 to be female. (More than one plaintiff is joined in some complaints.)

The Department of Justice has made an examination of 317 suits filed elsewhere in the United States. Statistics revealed in these suits show that among the families concerned in these 317 suits, 1215 male children were born as against 169 female. The Department of Justice also reports that a survey made in Hong Kong recently reveals that in the families of 149 applicants for certificates of identity, there was a ratio of 9 to 1 male births.

Statistics recently collected by the State Department from applications for certificates of identity filed in Hong Kong show that a preponderance of applicants claim birth on the day of the month corresponding to the number of the month, for example, the 2nd day of the 2nd month of the Chinese calendar. The government contends that this is indicative of fraud in that the dates are selected to make them easy to memorize.

In this district between the years 1947 to 1950 inclusive, there were 53 criminal prosecutions against Chinese for false claims of citizenship due to falsified birth certificates or travel documents. This is exclusive of a great many cases not prosecuted because of lack of evidence of criminal intent.

Consideration of these factors and circumstances does not mean that the court is conducting an investigation for the purpose of summarily disposing of all these cases. They are related solely in order to furnish some guide and aid in the judicial process of evaluating testimony offered to support claims to the priceless right of American citizenship. For each one of these cases requires the determination of the *identity* of the claimant to citizenship. And such identity rests upon evidence given in a foreign language as to birth, in an inaccessible foreign area, of persons born and living under a completely foreign culture, with no means of investigation or verification open to the people of the United States, who are vitally concerned. Furthermore, it is a foreign culture, which does not generally recognize ethical demands of society beyond family loyalty.[9]

The plaintiffs have alleged in their complaint that they have always considered themselves to be citizens of the United States and that it has *always* been their intention to come to United States and further that it has *always* been their intention to keep and maintain their domicile

---

9. See F. S. C. Northrup, The Taming of the Nations, MacMillan 1952; also Lin Yutang, My Country and My People, John Day, N.Y.1939.

and residence in the United States. But the evidence indisputably shows this to be untrue. To the contrary, the evidence shows these minor children to be Chinese in every sense of the word. They know, and knew, nothing about the United States except that their alleged father seeks to bring them here. And they come in compliance with that filial dictate.

Standards to be applied in weighing the testimony.

A proceeding under § 903 is a primary and original action. In my opinion, it is not a de novo proceeding, as has been stated. For to denominate a suit as de novo means that there has been some other proceeding concerning the same issue, but that the instant cause is being heard independent of such prior proceeding.

 But whether the suit be primary or de novo, the burden of proving plaintiffs' identity rests upon plaintiffs. Particularly is this so when the burden is to prove claimants' United States citizenship. Upon review of immigration proceedings where entry into the United States was sought by Chinese applicants upon the ground that the applicants were United States citizens, it has been held that the burden of proving applicants to be children of American citizens rested upon applicants. Won Ying Loon v. Carr, 9 Cir., 1939, 108 F.2d 91; Flynn ex rel. Yee Suey v. Ward, 1 Cir., 1939, 104 F.2d 900; Ex parte Lee Fong Fook, D.C.N.D.Cal.1948, 74 F.Supp. 68.

It would seem beyond question that a similar burden rests upon plaintiffs here.

Against the background of considerations described supra, what is the nature and extent of the burden of proof of plaintiffs?

Plaintiffs contend that they have made a *prima facie* case, that the burden of going forward consequently shifted to the defense, that since the defense presented no evidence, it failed to carry its burden, ergo, judgment should go for plaintiffs. Such reasoning begs the question as to what constitutes a prima facie case in this

sort of proceeding. Whether or not the showing made is prima facie depends upon the nature and extent of the burden of proof.

The burden of proof resting upon plaintiffs is to show that they are *persons* who, because of their *identity,* are entitled to be judicially declared to be American citizens.

This brings us to a consideration of what degree of proof is necessary in order to establish their identity.

 Constitutionally, only those born or naturalized in the United States and subject to the jurisdiction thereof, are citizens. Const.Amdt. XIV. The power to fix and determine the rules of naturalization is vested in the Congress. Const.Art. I, sec. 8, cl. 4. Since all persons born outside of the United States, are "foreigners," [10] and not subject to the jurisdiction of the United States, the statutes, such as § 1993 and 8 U.S.C.A. § 601, derive their validity from the naturalization power of the Congress. Elk v. Wilkins, 1884, 112 U.S. 94, 101, 5 S.Ct. 41, 28 L.Ed. 643; Wong Kim Ark v. U.S., 1898, 169 U.S. 649, 702, 18 S.Ct. 456, 42 L.Ed. 890. Persons in whom citizenship is vested by such statutes are naturalized citizens and not native-born citizens. Zimmer v. Acheson, 10 Cir., 1951, 191 F.2d 209, 211; Wong Kim Ark v. U. S., supra.

While under § 903, the courts are not granted the jurisdiction to "admit" to citizenship, as under the naturalization statutes, the jurisdiction to "declare" citizenship by naturalization pursuant to § 903 is substantially equivalent. This is so because under § 903, a decree favorable to petitioner in effect "makes" petitioner a citizen, whereas an unfavorable decree requires deportation. Consequently, in my opinion, a decree declaring citizenship by naturalization is in all respects the same as a decree *admitting* to citizenship. Indeed, the consequences of denying the prayer of petitioners here are much more dire than those resulting from denying petitions for naturalization, for in the latter case the pe-

10. See Boyd v. State of Nebraska ex rel. Thayer, 1892, 143 U.S. 135, 12 S.Ct. 375, 36 L.Ed. 103; U. S. v. Harbanuk, 2 Cir., 1933, 62 F.2d 759, 761.

titioners may remain, in most cases, in the United States, while in the former, the result is deportation.

The degree of proof therefore, required of plaintiffs, should be of substantive parity with that required of petitioners for naturalization.

It has been the rule in naturalization cases that an applicant for citizenship has the burden of convincing the court by satisfactory evidence that he is entitled to citizenship.[11] And that burden never shifts to the government.[12] In the reverse process of denaturalization, the rule is that citizenship may not be annulled except by clear, unequivocal and convincing evidence.[13]

Where entry into the United States is sought upon the basis of the entrant's claim to United States citizenship, the rule is that the proof of alleged citizenship must be clear and convincing.[14]

Clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty.[15] This high standard may be required to sustain claims which have serious social consequences or harsh or far-reaching effects on individuals.[16] To justify an exceptional judicial remedy [17] or to circumvent established legal safeguards,[18] the proof must usually meet this standard. Instruments which have established legal rights and warrant great reliance may not be contradicted except by this degree of proof.[19] As well, this standard is employed in cases where the opportunity for fraud and the temptation to perjury is great. Thus, this standard must be met to sustain certain claims which are easily fabricated and difficult to disprove, or which are evidenced merely by the oral testimony of interested witnesses as to events long past.[20]

11. U. S. v. Schwimmer, 1929, 279 U.S. 644, 649, 49 S.Ct. 448, 73 L.Ed. 889; Tutun v. U. S., 1926, 270 U.S. 568, 578, 46 S.Ct. 425, 70 L.Ed. 738; U. S. v. Macintosh, 1931, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; In re Laws, D.C.N.D.Cal. 1944, 59 F.Supp. 179; Petition of Boric, D.C.Or.1945, 61 F.Supp. 133, 136; Petition of Sam Hoo, D.C.N.D.Cal.1945, 63 F.Supp. 439.

12. See cases cited in Note 11.

13. Schneiderman v. U. S., 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; Baumgartner v. U. S., 1944, 322 U.S. 665, 64 S. Ct. 1240, 88 L.Ed. 1525.

14. Lee Sim v. U. S., 2 Cir., 1914, 218 F. 432, 435; Ex parte Chin Him, D.C.W.D. N.Y.1915, 227 F. 131, 133.

15. IX Wigmore on Evidence § 2498 at page 329 (3d Ed.1940); 32 C.J.S. Evidence, § 1023 (1942); 20 American Jurisprudence, Evidence, §§ 1252-1253 (1939).

16. E.g. note, 128 A.L.R. 713 (1940) (degree of proof to establish the illegitimacy of children born in wedlock); Note, 13 Minnesota Law Review 580 (1929) (proof of adultery in divorce actions); Note, 12 A.L.R.2d 153 (1950) (showing necessary for rescission of divorce decree after remarriage); Commissioner of Public Welfare v. Ryan, 1933, 238 App. Div. 607, 265 N.Y.S. 286 (proof in filiation proceeding); Johnson v. Feskens,

1934, 146 Or. 657, 31 P.2d 667, 107 A.L. R. 340 (proof to justify forfeiture under a contract); Dickson v. St. Louis & K. R. Co., 1902, 168 Mo. 90, 67 S.W. 642 (to divest title to real estate for breach of a condition subsequent).

17. E.g. 49 American Jurisprudence, Specific Performance, § 169 (1943) (proof of the existence of a contract when specific performance is demanded).

18. E.g. 1 American Jurisprudence, Acknowledgement, § 155 (1936) (to impeach an acknowledgement).

19. 36 Am.Jur., Mortgages, §§ 134-135 (1941); Note, L.R.A.1916B, 192 (to show an absolute deed is a mortgage); 9 Am.Jur., Cancellation of Instruments, § 63 (1937); 45 Am.Jur., Reformation of Instruments, §§ 116-117 (1943); Note, 94 A.L.R. 1278 (1935); Note, 48 A.L.R. 1462 (1927); 117 A.L.R. 1022 (1938) (to justify reformation or rescission of a written instrument for fraud, mistake, or undue influence).

20. E.g. 57 Am.Jur., Wills, §§ 981-983 (1948) (to prove a lost will); 57 Am. Jur., Wills, § 728 (1948); Note, 69 A.L. R. 167 (1930) (to prove agreement to leave property to another); Note, 7 A.L. R.2d 25 (1949) (proof of agreement for compensation for services rendered to a relative); 24 Am.Jur., Gifts, § 133 (1933) (to prove a parol gift after the death of the donor); 54 Am.Jur., Trusts,

The factors which have prompted the courts to exact a high standard of proof in other cases, are present to a great degree in these Section 903 cases. A judgment declaratory of the American citizenship of a person who has grown up in an alien culture and whose only claim to citizenship is based on heredity vitally affects the American people. All the rights and privileges of citizenship would be thereby vested in a person totally unprepared to exercise them.

'Both the temptation and the opportunity for fraud is great in these cases. American citizenship is indeed a prize for those persons seeking to escape the misery of Communist China. A plausible claim is easily presented and virtually impossible for the government to meet. The facts to substantiate the claim rest almost entirely within the sole knowledge of interested persons.

■ The standard of clear and convincing proof, I hold, should be applied in all cases where an applicant *invokes the judicial power* to affirm a claimed right of United States citizenship by naturalization. It should be applied in these § 903 cases.

■ Since I find the evidence presented in support of plaintiffs' cause to be neither satisfactory nor clear nor convincing, they have not sustained their burden of proof and their prayer should be denied.

The court does not find that the plaintiffs and their witnesses are not telling the truth. But rather I cannot tell whether they are or not. Their evidence has neither the satisfactoriness or clarity or convincing character that justifies, in effect, the conferring of American citizenship.

It may well be that Ly Shew is the father of the two plaintiffs. In denying the relief asked for in the complaint, I am not finding that he is not their father. I am denying the petition because the evidence does not meet the proper standards. In some respects it is so inconsistent as not to be credible. It may be said, and indeed was argued, that a decision adverse to the plaintiffs is cruel and that its effect is to separate a father from his children and to break up the home. The short answer is that the plaintiffs have always been with the alleged mother in China. Their home has always been there. The alleged father has rarely, if at all, seen the plaintiffs. In fact he never had seen the plaintiff Ly Sue Ning until she arrived in the United States. The father's permanent residence has always been in the United States. He has never had any home in China. For all practical purposes, the plaintiff children are strangers to him. So what is defeated by denial of relief here is not the family home but the effort to come into the United States.

■ During the trial, the government moved to strike certain statements of plaintiffs and their alleged father as to the alleged father's paternity. The statements were claimed to be admissible under the so-called "pedigree" exception to the hearsay rule. Upon the record, I see no need for resolving the claimed issue of law. I will allow the testimony to remain in the record. For I attach no weight to it. "The mere say-so of interested witnesses does not have to be accepted". Flynn ex rel. Yee Suey v. Ward, 1 Cir., 1939, 104 F.2d 902.

We can well understand the desire of those who speak for plaintiffs to have them admitted and join the American Citizenry. In every sense, so far as I am concerned, this is "God's Country." But as a court, we are guardians and custodians of a precious fund. Every American citizen has the right to demand that we do not dispense the fund except to those who are

§§ 620–624 (1945); 23 A.L.R. 1500 (1923) (oral proof of an express trust in realty or personalty, or of facts giving rise to a resulting or constructive trust); Furman v. St. Louis Union Trust Co., 1936, 338 Mo. 884, 92 S.W.2d 726 (proof of agreement to adopt as basis for sustaining right to inheritance);

The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co.), 1892, 143 U.S. 275 at page 284, 12 S.Ct. 443, 36 L.Ed. 154 (to prove prior anticipatory use of an invention); Commissioner of Public Welfare v. Ryan, 1933, 238 App.Div. 607, 265 N.Y.S. 286 (proof in filiation proceedings).

60

unequivocally entitled to share in it. If we are satisfied to apply any lesser standards in these cases, we might just as well issue a rubber stamp decree admitting all the plaintiffs in the 716 suits filed in this district. But this would be a completely unbecoming judicial act and obviously I won't perform it.

Judgment for defendant upon findings to be presented pursuant to the Rules.