UNITED STATES ex rel. DONG
WING OTT et al.

v.

SHAUGHNESSY.

United States District Court,
S. D. New York.

Dec. 11, 1953.

Joseph J. Davidson, New York City (John C. Delaney, New York City, of counsel), for relators.

J. Edward Lumbard, U. S. Atty. for the Southern Dist. of N. Y., New York City (Philip M. Drake, Asst. U. S. Atty., New Rochelle, N. Y., and Lester M. Friedman, Immigration and Naturalization Service, New York City, of counsel), for respondent.

MURPHY, District Judge.

The issues in this case arise from a writ of habeas corpus issued by one of the judges of this district on September 14, 1953. Relators arrived in New York on April 25, 1952. They sought admission as United States citizens pursuant to Section 1993, Revised Statutes, as sons of a native American citizen father, Dong How Lung, and a legally resident alien mother, Chin You Yook.

The father's citizenship and the fact that he was in China at the time when conception normally would have occurred for relators are conceded. The father has already brought to the United States and secured the admission of four of his putative sons and one such daughter. The relators are alleged to be the two youngest sons of his family.

There is no testimony establishing the claimed relationship except that of relators and their alleged parents. No offers of proof were made by family photographs, letters, evidence of monetary remittances or any of the usual indicia of long standing family relationship.

The Board of Special Inquiry found that relators had reasonably good knowledge of the claimed mutual family background and the outward physical appearance of their alleged native village, and that they were able to recite names, ages and family relationships of their various supposed relatives born in China and in the United States.

The decision of exclusion by the Board was based solely on the results of tests which were performed of specimens of blood of the relators and their alleged parents. These tests showed incompatibility of blood between relators and their alleged parents.

At the first hearing before the Board held on July 15, 1952, there was offered in evidence four exhibits of four blood tests dated July 2, 1952, signed by George F. Cameron, Surgeon, U. S. Health Service, relating to the relators and their alleged parents. Counsel for the relators, who is the same counsel on the present writ, stated when this offer was made, "I do not object to their admission into evidence." There was then offered in evidence as Exhibit 5 a pamphlet reprinted from the U. S. Law Review of December 1936 entitled, "Blood Grouping Tests in the New York Courts" by Alexander S. Weiner. Relators' counsel objected to its admission on the basis that it was hearsay and that he should have an opportunity to examine the author. His objection was overruled and the exhibit received.

Before any determination was made by the Board counsel for the relators requested that the hearing be continued "in order to give me an opportunity to discuss the matter of a blood test with an expert and to decide whether or not to present an expert witness." This motion was granted and the hearing was continued until July 22d.

On July 22d the continued hearing was opened by this statement of the Chairman to counsel: "This hearing was deferred in order to give you an opportunity to discuss the matter of the blood typing with an expert and to decide whether or not to present an expert witness. What are your desires in this

matter?" Counsel answered: "I will not produce an expert." Then the Chairman said: "Do you have any further evidence or exhibits?" Answer: "I haven't any further evidence."

Comparing the results of the blood grouping and typing tests performed on the relators and their parents, Exhibits 1 to 4, with the charts contained in Exhibit 5, the Board found that relator Dong Wing Ott might possibly be the son of Dong How Lung and Chin You Yook under blood grouping test A & B. However, the possibility of such parentage was excluded as to him under blood typing test M & N. With respect to relator Dong Wing Han the possibility of his parentage was excluded on the basis of both the blood grouping and blood typing tests.

On December 9, 1952, the Board of Immigration Appeals, at the request of counsel, ordered that the hearings be reopened in order that new and material evidence and reexamination of relators be had on the issue of their claimed relationship. On December 11, 1952, before reopening of the hearings, counsel for relators requested by letter to the Director of Immigration and Naturalization issuance of subpoena to one of its officers to testify with respect to the rules and regulations of the Immigration and Naturalization Service relating to blood grouping tests. In the same letter he also asked for the personal appearance of the doctors upon whom the Immigration and Naturalization Service relied to establish its finding that the aliens be excluded.

At the reopened hearing of January 8, 1953, the Chairman denied counsel's request for the issuance of a subpoena, stating that the rules and regulations of the Immigration and Naturalization Service were a matter of public information and consequently he considered it not in order to produce testimony about them. Counsel for relators was informed on request that Dr. Cameron was still in the Public Health Service in New York. But his inquiry concerning whether Dr. Weiner was still within the jurisdiction of the Service in New York was met by the Chairman with, "that question is deemed out of order." The Chairman then denied request of counsel to subpoena or present as witnesses either Dr. Weiner or Dr. Cameron.

At this point counsel requested the Chairman, Mr. Bernsen, to take the stand as a witness for the purpose of establishing that the blood grouping tests of these Chinese are discriminatory. Counsel argued that these blood grouping tests have been applied only to the Chinese race and that, in his opinion, was discriminatory and in violation of the aliens' constitutional rights. Mr. Bernsen refused to take the stand as a witness. Counsel then asked Mr. Bernsen if he would state whether blood grouping was used in connection with any other than the Chinese race. The Chairman ruled "that no member of this Board will submit to any examination relative to the investigative procedures of the Immigration and Naturalization Service."

Over counsel's objection, a letter from Dr. Cameron, addressed to the Board, dated January 7, 1953, was then offered in evidence. This letter stated that the laboratory under his direction at the United States Public Health Service Hospital in Staten Island had in the past and continued to examine blood from individuals referred to it by the Immigration Service for the purpose of establishing such individuals' blood group in the A–B–O System, the M–N System and the Rh System; that the laboratory was competent to perform the mechanics of these examinations; that he personally did not feel that he had the background in blood grouping genetics to qualify as an expert in the medicolegal applications of blood grouping tests; that he recommended Dr. Alexander S. Weiner as an outstanding authority and that Dr. Weiner's article "Blood Grouping Tests in the New York Courts" appearing in the publication, "United States Law Review," December 1936, was considered a currently accurate source of authoritative information on the subject. The

only evidence introduced by relators was the statement by each that neither of them knew the purpose of the blood test at the time it was made. The Board ruled that, since no material evidence had been introduced, the former findings and conclusions were reaffirmed.

On April 8, 1953, the Board of Immigration Appeals, at the request of counsel for relators, again reopened the hearings for the purpose of producing Dr. Cameron for cross-examination concerning the mechanics followed in making the blood grouping tests, but not for cross-examination as an expert on the interpretation of these tests because Dr. Cameron did not profess to be an expert.

On April 22, 1953, at the reopened hearing, Dr. Cameron was produced and cross-examined by counsel for the relators. He testified that he was the Medical Director, Chief of Pathology, at the United States Public Health Service Hospital, Staten Island, New York; that he had ten medical technicians working directly under him in the laboratory; that the tests were made for the father and mother on June 3, 1952, and for the two relators on May 29, 1952; that the Immigration and Naturalization Service received a request from the American Consul in Hong Kong for the blood typing of certain United States citizens of Chinese descent who were claimed as parents by foreign born applicants for United States passports; and that the United States Public Health Service agreed that their stations perform these tests at a charge of $2 each. Dr. Cameron identified the medical technician who took the four tests in question as Frank Monica, who had been in the laboratory for seven years. The method of taking and recording the tests was explained by Dr. Cameron. According to him, theoretically it was possible to mislabel a specimen, or improperly to apply reagents to it. He admitted that there were errors inherent in the test itself and in its interpretation, and that on one or two occasions the second test had different results from the first. The procedure for making the tests consisted of penetrating the subject's finger with a sterile needle, after the finger surface had been sterilized. One or two drops of blood thus extracted were placed in a test tube containing a salt solution. A portion of this diluted material was smeared on a glass slide, and M and N testing serum then mixed with this diluted material. After five minutes, the slide was examined microscopically to determine the presence or absence of clumped blood cells. From this examination the blood type, M or N or MN, was arrived at. The A, B, AB and O blood groups were determined in identical manner, except that different reagents were added to the blood solution expressly for the purpose of A, B, AB and O blood groups. Dr. Cameron reiterated that he did not consider himself sufficiently expert to testify on the entire subject of blood grouping tests; that Dr. Weiner was an outstanding authority and that blood grouping tests were controversial.

There was also introduced at this hearing a letter from the District Director to counsel dated August 11, 1952, stating that the Board of Special Inquiry was prepared to reopen the hearing for the purpose of including the results of a second blood grouping and typing test of the two relators and their alleged parents. "The reason for the second test is to insure against the possibility of error having been made in the first test in the laboratory or a clerical error in submitting the report." Counsel was asked to make arrangements at his earliest convenience.

The Chairman asked the relators if they would be willing to submit to any additional blood tests and counsel replied that another blood group test would be in violation of their constitutional rights until "the question has been finally decided." Counsel was then asked whether he had anything further to state to the Board before taking action and he replied that he did not.

The Board then reaffirmed its finding and on July 1, 1953, the Board of Immigration Appeals affirmed with a lengthy opinion dismissing the appeal.

■ Counsel for relators in his discrete brief purports to raise questions running the entire constitutional gamut. "(T)he Chinese in this proceeding have constitutional rights and the Fourth, Fifth, Sixth and Fourteenth Amendments are applicable to them," is illustrative of this grapeshot. The inapplicability of the Fourteenth Amendment to federal proceedings requires no documentation after more than four score years since its adoption. However, the court itself considers three important questions necessarily involved: *(I)* Whether relators were denied due process in a procedural sense under the Fifth Amendment by administrative "official notice" of the treatise of Dr. Weiner on interpretation of blood grouping tests; *(II)* Whether, in view of the hearsay nature of this evidence, it is sufficient to support the administrative finding under this judicial review; and *(III)* Whether alleged discriminatory use of such blood tests on the Chinese alone requires this writ to be sustained.

### I

■ The first question is whether procedural due process was denied by administrative official notice of the treatise of Dr. Weiner on the interpretation of blood grouping tests. Important in resolving this question is the nature of the evidence thus noticed. Are the noticed evidential facts ones of relatively wide knowledge consisting of general or universal propositions, on one hand, or specific proof relating only to the case under consideration and asserting a particular proposition, or series of them, on the other hand? A court or administrative agency may properly take official notice of a depression or decline in market values, but not the precise extent of such decline as it affects value of particular property of a utility company in a proceeding to fix a fair rate.[1] What has been noticed in this case is not the particular blood grouping of relators and their putative parents, but rather the general apperceptive mass of data for interpreting such specific tests. If indeed the Weiner treatise has been considered appropriate subject matter for judicial notice in some instances,[2] it should be regarded in no less light for official notice by an administrative tribunal.

■ "Nothing can be treated as evidence which is not introduced as such,"[3] but the Weiner treatise was in fact admitted as evidence at the first hearing before the Board of Special Inquiry on July 2, 1952. As part of the record, reviewing courts have full opportunity to appraise its probative value and relators apprised of its function as basis of the administrative determination. Offered as evidence when it was, seasonable opportunity for its rebuttal was in fact accorded relators at the initial hearing and numerous subsequent ones. The "notice" requirement of procedural due process has been unquestionably met. We do not think the requisite opportunity for hearing on the merits was denied by failure of the tribunal to produce the author of the treatise for cross-examination by relators. The general nature of the treatise, as already considered, and the fact that as evidence in chief the treatise was relied upon only as hearsay, did not require that the tribunal accord superior opportunity for rebuttal to relators by personal cross-examination of the author, as a matter of requisite procedural due process. Relators had opportunity at every hearing to refute the treatise by calling their own experts, directing attention of the tribunal to the numerous *caveats* in the treatise in evidence, or by offering other treatises disputing the one in evidence.

Accordingly, purely as a matter of notice and opportunity for hearing on the

---

1. Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S. Ct. 724, 81 L.Ed. 1093.

2. Commissioner of Welfare of City of N. Y. ex rel. Tyler v. Costonie, 277 App. Div. 90, 91–92, 97 N.Y.S.2d 804; Jordan v. Mace, 144 Me. 351, 69 A.2d 670.

3. United States v. Abilene & Southern Ry. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016.

merits, we find no substantial objection in the administrative notice of the Weiner treatise.

## II

■ A more serious objection inheres in the question whether, in view of. the hearsay nature of the evidence of the treatise, it is sufficient to support the administrative finding. Even when by statute an agency is not bound by the rules of evidence, and even though the agency "may in its discretion accept any evidence that is offered; still in the end there must be a residuum of legal evidence to support the claim before an award can be made."[4] In the instant case, everything but the reports of the blood grouping tests indicates that relators are children of an American citizen and his wife; and the hearsay reports have been given conclusive effect over all direct and competent evidence to the contrary.

The status of the residuum rule is by no means crystal clear in the federal courts. Congress has explicitly avoided the requirement of competent evidence to support findings in the Administrative Procedure Act.[5] In February, 1938, the Supreme Court denied certiorari in a case in which L. Hand, Ct. J., observed that "no doubt, that does not mean that mere rumor will serve to 'support' a finding, but hearsay may do so, at least if more is not conveniently available, and if in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious

affairs."[6] Yet in December of the same year, the Supreme Court wrote, "Mere uncorroborated hearsay or rumor does not constitute substantial evidence",[7] and this, though dictum, has survived discredit. Again in numerous cases exclusion and deportation of aliens have been sustained on the basis of hearsay.[8] Yet in the controversial and more recent case of Bridges v. Wixon,[9] the Supreme Court, five to three, reversed a deportation order based on hearsay evidence, notwithstanding opportunity for cross-examination of the extra-tribunal declarant.

Two separate sets of hearsay evidence are involved in the instant case. One concerns the making and classification of blood groupings of relators described by the testimony of Dr. Cameron who generally supervised but did not himself conduct the analyses. Relators repeatedly failed to object to this set of facts and indeed declined all proferred opportunity for retesting. This circumstance distinguishes the instant case from a similar recent one in this court.[10] The hearsay statements "in question were received in evidence without objection. And even in a court of law if evidence of this character is admitted without objection it is to be considered and must be accorded 'its natural probative effect as if it were in law admissible'."[11]

■ Such, however, is not the posture of Weiner's treatise offered as hearsay interpretation of the blood grouping tests. Without this evidence, the admin-

4.  Carroll v. Knickerbocker Ice Co., 218 N.Y. 435, 440, 113 N.E. 507. See also Model State Administrative Procedure Act § 12(7) (e). But cf. Altschuller v. Bressler, 289 N.Y. 463, 470, 46 N.E.2d 886.

5.  5 U.S.C.A. § 1001 et seq. See also Sen. Doc. No.248, 79th Cong., 2d Sess. 30, 208, 270; Davis, Administrative Law (1951) § 145.

6.  N.L.R.B. v. Remington Rand, 2 Cir., 94 F.2d 862, 873, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540.

7.  Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126.

8.  Yong Yung See v. United States, 9 Cir., 92 F.2d 700; Singh v. District Director, 9 Cir., 96 F.2d 969; The Washington, D.C.S.D.N.Y., 19 F.Supp. 719. See also U. S. ex rel. Vajtauer v. Commissioner, 273 U.S. 103, 106, 47 S.Ct. 302, 71 L. Ed. 560.

9.  326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103.

10. United States ex rel. Lee Kum Hoy v. Shaughnessy, D.C., 115 F.Supp. 302.

11. Opp Cotton Mills, Inc., v. Administrator, 312 U.S. 126, 155, 657, 61 S.Ct. 524, 537, 85 L.Ed. 624.

istrative finding is unsupported. There is no other competent corroborative evidence, indeed all such evidence is to the contrary. Although the treatise may properly be considered as "the kind of evidence on which responsible persons are accustomed to rely in serious affairs", yet it cannot be said that the author himself, or some similar expert was "not conveniently available".[12] This defect consequently is sufficient to sustain the writ unless the hearing before the Board of Special Inquiry is reopened as indicated *post*.

### III

The third question is raised by administrative rejection of relators' offer of proof of discriminatory use against Chinese alone of blood grouping tests in exclusion proceedings. Unlike the Fourteenth, the Fifth Amendment raises no explicit restriction of denial of equal protection of the laws against the federal government. Whether the due process clause in the Fifth Amendment absorbs and makes applicable against the federal government the guaranty of equal protection in the Fourteenth, in the same manner as the due process clause in the Fourteenth Amendment has made applicable to the States certain guaranties of the first eight amendments implicit in "the concept of ordered liberty,"[13] is not necessary to resolve in this case.[14] Nor is the question similar to one presented by the historic Chinese Exclusion Acts, enacted in 1882[15] and repealed in 1943,[16] in which the classification was one made by Congress. What is sought to be established by evidence in this case is an alleged discriminatory use of blood tests against Chinese applicants, and not others, by dint of administrative action alone. It is sufficient to observe that if discrimination by federal courts with respect to selection of jurors amounts to reversible error whether under the due process clause of the Fifth Amendment or the supervisory power of the Supreme Court over lower federal tribunals,[17] then it ought to be a matter of grave concern in review of federal administrative action.

We do not intimate that a record in which it is conceded that such blood grouping tests are used only on Chinese and this by administrative sanction alone, would require this court to sustain the writ. Judicial notice of data in reported cases in this court may well justify special classification and treatment of Chinese applicants for admission on the basis of disputed filiation with American citizens. From 1947—four years after repeal of the Chinese Exclusion Acts and simultaneous declaration of eligibility of that group for naturalization—until the beginning of this year— about 1288 petitions such as the instant one have been brought in courts throughout this country. About three-fourths of them have been filed in the federal court in the northern district of California. A study of these 716 cases shows 95 per cent of the claimants alleging birth in Kwang Tung Province and 62 per cent in the Toy Shan District of that province in villages unknown on maps available to Immigration authorities. In 354 of the 716 cases (many, as the instant one, in-

12. N.L.R.B. v. Remington Rand, supra.

13. Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288. See also Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L. Ed. 158; Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782. But cf. Hurtado v. California, 110 U.S. 516, 4 S. Ct. 111, 292, 28 L.Ed. 232; Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903.

14. Cf. Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L. Ed. 1774; Toyosaburo Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194.

15. 22 Stat. 58.

16. 57 Stat. 600.

17. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S. Ct. 984, 90 L.Ed. 1181.

volving more than one claimant) 367 of the claimants were male against only 39 female. A study of families involved in 317 other cases shows a startling distribution of children born: 1215 male against 169 female. A survey in Hong Kong reveals that in families of 149 applicants for identity certificates there was a ratio of 9 to 1 male births. A preponderant number of these claimants allege birth on the same day of the same month, e. g., the 2d day of the 2d month.[18] The almost miraculous congruity and duplicative evasion in the testimony of these putative parents and children in these cases has been noted.[19]

This court, we repeat, might take judicial notice of this data on the existence of fraudulent claims in such vast scale.[20] So also might the administrative tribunal involved. But to do so at this stage of the proceeding without according relators opportunity for rebuttal would seriously impair procedural due process, as indicated in *I, ante*.

Accordingly, the writ will be sustained unless within 20 days from the date of the order to be entered hereon, the hearing before the Board of Special Inquiry is reopened for proceedings not inconsistent and in accordance with this opinion.

Settle order on notice.

---

18. Ly Shew v. Acheson, D.C.N.D.S.D.Cal., 110 F.Supp. 50, 54–56 (data compiled).

19. Mar Gong v. McGranery, D.C.S.D.C.D. Cal., 109 F.Supp. 821.

20. For an instance of such notice of a companion case, see West Ohio Gas Co. v. Public Utilities Commission (No. 1), 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761.