**LUE CHOW KON et al.**

v.

**BROWNELL.**

United States District Court
S. D. New York.
June 22, 1954.

Haskell R. Barst, New York City, for plaintiffs.

J. Edward Lumbard, U. S. Atty., New York City, Matthew A. Campbell, Asst. U. S. Atty., Brooklyn, of counsel, for defendant.

IRVING R. KAUFMAN, District Judge.

These are three suits brought by the plaintiff Lue Chow Kon and the infant plaintiffs Lue Chow Lon and Lue Chow Yee by their alleged father and guardian Lue Don Wing. At the trial of this action, Lue Chow Lon moved for leave to continue the suit in his own name in view of the fact that the said plaintiff has now reached the age of 21. This motion was granted. The separate actions by the above named plaintiffs were consolidated for trial.

The actions are brought pursuant to Section 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903,* for a judgment declaring the plaintiffs nationals of the United States. Plaintiffs claim United States citizenship by virtue of Section 1993 of the Revised Statutes.[1]

It has been stipulated and ordered in the pretrial order that for the purposes of this action Lue Don Wing is a citizen of the United States, and the question of fact for the Court is whether the plaintiffs, Lue Chow Kon, Lue Chow Lon and Lue Chow Yee are the true sons of Lue Don Wing.

Lue Don Wing was admitted to the United States as a citizen on October 1, 1920. His citizenship was derived from his father, by virtue of the citizenship of the latter. Wing made two visits to China after he entered this country in 1920. He departed for China from San Francisco on October 4, 1923 and returned to this country August 8, 1924. He went to China again in 1931, leaving the United States on November 6 of that year and returning to this country on April 10, 1935. He claims that during his first visit to China he married one Lee Shee and that his first son, the plaintiff Kon, was born on January 4, 1925, after he had returned to the United States. Wing further claims that his other two sons were born during his second visit to China; Lon, on November 10, 1932, and Yee on January 8, 1934. It appears that no marriage according to Western standards was performed but some ritual according to Chinese customs is alleged to have been carried out. No marriage certificate is available nor were any records introduced corroborating the births of the plaintiffs at the times and places alleged. Plaintiffs had never been to the United States until they arrived here on May 20, 1949, for the purpose of prosecuting these actions.

The testimony of the plaintiffs (and their alleged father) at this trial which lasted three days was given through an

---

* Now 8 U.S.C.A. § 1503.

1. Section 1993: "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States." Now 8 U.S.C.A. §§ 1401, 1431.

interpreter. Neither Lue Don Wing, the alleged father, nor the plaintiffs could speak English. Inconsistencies and contradictions in the testimony were many. Pages could be consumed in citing the inconsistencies between the affidavits of the plaintiffs given to the Vice-Consul in Canton City, their testimony before the Special Inquiry Board in San Francisco, and their testimony at this trial. A few of the more flagrant contradictions are cited.

Lue Don Wing testified on the first day of trial that shortly after he arrived in China on a visit in 1931, he took the plaintiff Lue Chow Kon to Canton and placed him with a friend in order that Kon could go to the City School. Wing further testified that Kon remained at school in Canton for four or five years, until the Japanese occupied the city, and that he therefore was absent from home when a picture of Wing, purportedly with his alleged wife and the other plaintiffs, Lue Chow Lon and Lue Chow Yee, was taken shortly before Wing's return to the United States in the spring of 1935. (Plaintiffs' Exhibit 2). Before the Immigration Inspector at San Francisco in 1949, Wing had stated that Kon attended school in Get-on Village from the age of nine to seventeen and that it was not until he had finished school that Kon had gone to Canton to work. Presented with this previous inconsistent testimony, Wing stated that he had made a mistake in testifying that Kon had attended school in Canton for four or five years, and that, in fact, he had taken Kon to school in Canton, but that Kon had returned to Get-on Village a few months later. Kon himself next took the stand and, unaware that Wing had changed his original testimony, Kon stated that he was taken to school at Canton shortly after Wing's arrival in China in 1931, and that he remained in Canton for four or five years. Kon also stated that he had been at school in Canton for two or three years before Wing returned to the United States in 1935.

On the second day of trial Kon reversed his testimony and stated that he had made a mistake the day before and that he had remained in school in Canton only a few months before returning to Get-on Village. Kon further stated that he had not discussed his earlier testimony with anyone and that he had realized his mistake himself.

I am convinced that these contradictions by Wing and Kon cannot be explained as honest errors. On re-direct Wing stated that he had no independent knowledge of Kon's school years at Canton until he was seventeen but that he (Wing) had been informed by letter from his wife. Both Wing and Kon had earlier testified, however, that Kon was at Canton for two or three years before Wing's return to the United States in 1935, and if this is true, Wing knew of his own knowledge whether Kon did or did not return to Get-on Village after only a few months in Canton. Furthermore, while Kon, a child of eight or nine at the time, might be expected to err as to incidental events of some twenty years ago, it is incredible that he could not remember whether he spent several *months* or several *years* at school in Canton. It is even more incredible that Wing could be honestly mistaken as to whether one of his sons was at home in Get-on Village during several *years* of his second (and last) visit to China. I can only conclude that this part of plaintiffs' story is fabricated, and further, that the net result is a lack of any explanation for Kon's absence from the family picture, introduced as Plaintiffs' Exhibit 2.

The trial testimony of Lue Chow Lon was also peppered with inconsistencies. He testified, for example, that he did not know the meaning of the word "Halgoon" although it became clear upon further questioning that he knew the word meant a "testimony paper" or family history paper. Lon testified also that although he had received a letter from his father in 1947 concerning arrangements for plaintiffs' trip to the United States, the letter was not a "testimony paper" and contained no information or names of plaintiffs' alleged relatives and family background. At an earlier appearance

before Immigration officials at San Francisco on May 26, 1949, however, Lon explicitly stated that in 1947 Wing had sent him and his brothers testimony papers containing certain family names, birth dates, etc. (Defendant's Exhibit E). At the trial Lon denied having made these statements.

Further inconsistencies were also apparent in Lon's testimony. He stated at the trial that although he had signed the name "Wong" rather than "Lue" to a paper presented for signature at the San Francisco hearing, the error occurred because after his family moved from Get-on Village to Nom Ning Village, he had gone under the name of Wong in order to enjoy the protection afforded in Nom Ning Village to Wong family members.

At the trial, Lon also categorically denied ever having discussed this case with his alleged father or brothers. In view of the nature of the action and the relationship of the parties such an unequivocal denial taxes the credulity of the Court beyond the breaking point. It is a damaging commentary on Lon's credibility since it indicates how tenaciously he would hold to his story, whether true or false, when it appeared to him necessary to do so. It is ironical that one should so undermine his own credibility because of the mistaken notion that he would be confessing to a wrongful act if he admitted having discussed his case with his alleged father and brothers.

The third plaintiff, Chow Yee, also taxed the intelligence of this Court by testifying that although he had engaged in some discussion of the case with his father and brothers, he had never discussed the facts of the case with them.[2]

■ With this brief background, let us consider by what standards the testimony offered here will be judged. It has been well established that in suits of this type the burden of proving plaintiffs' identity rests upon the plaintiffs. See Ly Shew v. Acheson, D.C.N.D.Cal.1953, 110 F.Supp. 50, 57, and cases cited there.[3] The evidence should be clear and convincing for claims to derivative citizenship are easily fabricated and difficult to expose. Judge Goodman in Ly Shew recognized that the temptation and the opportunity for fraud in these cases is great. He stated, 110 F.Supp. at page 59:

> "American citizenship is indeed a prize for those persons seeking to escape the misery of Communist China. A plausible claim is easily presented and virtually impossible for the government to meet. The facts to substantiate the claim rest almost entirely within the sole knowledge of interested persons."

■ By any rule of evidence properly applicable to civil litigation, these plaintiffs have failed to sustain their burden. Not only have they failed to convince this Court by "clear and convincing proof" but they have failed to establish their right to relief by "a fair preponderance of the evidence", for I have already indicated that their contradictions and inconsistencies have convinced me that their testimony is not credible. Indeed, their demeanor on the witness stand and their evasiveness in replying to clear questions (making due allowance for the use of an interpreter) further support this conclusion.[4]

But there is more to this case than appears in any of the previous Chinese exclusion cases on record. In addition to the failure of the plaintiffs to sustain their burden of proof, the government has introduced evidence of a scientific nature which would carry substantial

---

2. It is to be remembered that the plaintiffs came to this country and have remained here for several years for but one purpose—to try this case.

3. A splendid discussion of the special problems involved in the type of Section

903 cases present here is contained in the Ly Shew case, supra.

4. Perhaps the clearest example of false testimony, as already indicated, is Lue Chow Lon's unambiguous statement that he had never discussed the instant case with his alleged father or brothers.

374

weight in overcoming plaintiffs' case even had they otherwise successfully carried their burden. Dr. Leon H. Sussman, an expert in the field of serology, testified that he had made tests of blood taken from the plaintiffs and their alleged father. Using what for convenience here can be classified as the M-N system of blood grouping, Dr. Sussman found Lue Don Wing to have type N blood; that is, blood which contains two possible hereditary elements, N and N. Regardless of the type of blood of the mother, every child of Lue Don Wing would have blood which contained as at least one of its two elements, an N element inherited from Lue Don Wing.[5] One of the plaintiffs, Lue Chow Kon, however, according to Dr. Sussman's testimony, was found to have type M blood; that is, blood containing the elements M and M. Since Kon's blood did not contain an element N, he cannot be the son of Lue Don Wing. The blood grouping tests did not exclude the other plaintiffs as possible sons of Lue Don Wing. Lue Chow Lon and Lue Chow Yee both had blood type N. Thus, they could be the sons of the alleged father or of any other man with N type blood. As to these two plaintiffs, the blood grouping tests neither proved nor disproved their claims.

It is to be noted, however, that plaintiffs have consistently maintained that they are all true brothers. If this is a fact, Dr. Sussman testified that Lue Don Wing cannot be the father of any of them, for a father of *all three* would have to have a blood type MN. Thus, by a strange twist, plaintiffs' claim that they are brothers is not scientifically consistent with their claim that they are all sons of Lue Don Wing.

Objection was made to the introduction in this case of evidence of blood grouping tests. Such evidence is clearly admissible. Under § 306-a of the New York Civil Practice Act, blood grouping tests may be ordered and introduced in evidence where relevant, and for the purpose of *ex*cluding paternity, in any proceeding pending in a court of record. See Commissioner of Welfare of City of N. Y. ex rel. Tyler v. Costonie, 1st Dept.1950, 277 App.Div. 90, 97 N.Y. S.2d 804; C. v. C., Sup.Ct.Spec.Term, Kings Co., 1951, 200 Misc. 631, 109 N.Y. S.2d 276. Such evidence is therefore similarly admissible in the Federal Courts. Federal Rules of Civil Procedure, rule 43(a), 28 U.S.C.A. As to the weight to be given to blood-grouping tests in excluding paternity, the government's expert witness convincingly testified as to the care used in carrying out the tests and as to the scientific conclusiveness of the results achieved. While I find it unnecessary to rest my decision on these tests alone, even as to the plaintiff Lue Chow Kon, I am convinced the test results are unassailable.

Taking full account of the barriers of language, time and distance, and of the inevitable minor inconsistencies which are sure to appear in such a long and complex story as this case reveals, I am nevertheless compelled to the conclusion that the plaintiffs have fallen far short of proving that they are the sons of Lue Don Wing.

Submit decree.

---

5.  For an enlightening analysis of the scientific-legal aspects of blood-grouping tests, see 1 Wigmore, § 165a et seq.